UNITED STATES COURT OF APPEALS
EIGHTH CIRCUIT

**Nos. 12-2056, 12-2060, 12-3794, 12-3875**

RONALD C. TUSSEY; CHARLES E. FISHER; TIMOTHY PINNELL,
*Plaintiffs-Appellees*,

v.

ABB, INC.; JOHN W. CUTLER, JR.; PENSION REVIEW COMMITTEE OF
ABB, INC.; PENSION & THRIFT MANAGEMENT GROUP OF ABB, INC.;
EMPLOYEE BENEFITS COMMITTEE OF ABB, INC.,
*Defendants-Appellants* (Nos. 12-2056, 12-3875)

*and*

FIDELITY MANAGEMENT TRUST COMPANY; FIDELITY MANAGEMENT
& RESEARCH COMPANY,
*Defendants-Appellants* (Nos. 12-2060, 12-3794)

Appeals from the United States District Court
for the Western District of Missouri,
No. 2:06-cv-04305-NKL
Hon. Nanette K. Laughrey, presiding

**BRIEF OF PLAINTIFFS-APPELLEES**

SCHLICHTER, BOGARD & DENTON LLP
Jerome J. Schlichter
Troy A. Doles
Heather Lea
Michael A. Wolff
100 South Fourth Street, Suite 900
Saint Louis, Missouri 63102
(314) 621-6115

*Attorneys for Plaintiffs-Appellees*

{01459183.DOCX; 1}

# SUMMARY OF THE CASE

In a detailed, comprehensive, eighty-one page order, issued after a four-week bench trial with twenty-four witnesses, sixteen attorneys, and hundreds of exhibits, and reams of briefing, the district court declared that the fiduciaries of Plaintiffs' retirement plans breached their duties under the Employee Retirement Income Security Act (29 U.S.C. §1001 *et seq.*) and caused Plaintiffs' retirement plans to lose $36.9 million. The court found the defendant-fiduciaries egregiously breached their duties by using Plaintiffs' retirement plans for their own benefit to generate revenues for one group of fiduciaries (the Fidelity Defendants), who in turn provided free and low-cost corporate services for the other group of fiduciaries (the ABB Defendants), and specifically, Plaintiffs' employer (ABB, Inc.). The district court's decision is factually intensive, and amply supported by the voluminous evidence in this case, by credibility determinations, and by weighing of conflicting inferences and facts that are virtually unreviewable on appeal. Defendants improperly seek to have this Court sit as a new trier of fact, re-weigh the evidence, and come to a different conclusion.

Because the issues properly reviewable on appeal are limited, Defendants *combined* should need no more than twenty minutes to make their arguments. Plaintiffs ask that they be given the same time for argument as the Court may give to both Defendants, combined.

Appellate Case: 12-2060     Page: 2     Date Filed: 05/15/2013 Entry ID: 4035705

# TABLE OF CONTENTS

Summary of the Case ................................................................. i

Table of Authorities ................................................................. v

Introduction ........................................................................... 1

STATEMENT OF FACTS ......................................................... 2

I.     The PRISM Plans and the ABB Defendants. ........................... 2

II.    Plan recordkeeping fees and mutual fund revenue sharing. ............ 3

III.   The mutual benefits of the Fidelity and ABB relationship. ............ 5

IV.   The PRISM Plans' Investment Policy Statement. ...................... 6

V.    Cutler's thwarted attempt to enforce the IPS, and ABB's enhancement of its corporate benefits at the cost of the PRISM Plans ................... 8

VI.   Fidelity's earning of float interest on Plan assets. ..................... 14

VII.  The district court's judgment. ............................................. 14

SUMMARY OF THE ARGUMENT ............................................. 18

ARGUMENT .......................................................................... 21

I.    ABB breached its fiduciary duties by causing the Plans to pay excessive recordkeeping fees and suffer losses of $13.4 million. ................. 21

    A.  ABB was motivated by conflicts of interest in generating revenues from the Plans for Fidelity. *ABB Issue 3.* ................................ 21

    B.  The IPS was one of the "documents and instruments governing the plan" under 29 U.S.C. §1104(a)(1)(D); ABB thus was obligated to follow it. *ABB Issue 1.* .......................................... 22

    C.  ABB breached the IPS and ERISA's fiduciary standards by causing the Plans to pay excessive recordkeeping fees. *ABB Issues 9, 10* ............ 28

    D.  ABB is entitled to no deference for its fiduciary acts or its interpretation of the IPS. *ABB Issue 2.* ............................ 31

    E.  *Hecker*, *Loomis*, and *Renfro* have no bearing on this case. *ABB Issue 8.* ............................................................. 37

    F.  The Plans lost $13.4 million. *ABB Issue 11.* ....................... 40

Appellate Case: 12-2060    Page: 3    Date Filed: 05/15/2013 Entry ID: 4035705

II.    ABB breached its fiduciary duties by unilaterally transferring participant investments in the Wellington Fund into Fidelity's Freedom Funds, causing Plan losses of $21.8 million. ................................47

    A.  ABB violated the IPS and ERISA's fiduciary duties by transferring Wellington Fund investments to Fidelity's Freedom Funds. *ABB Issues 1, 5.*................................................................................47

    B.  Replacing Wellington with Fidelity's Freedom Funds was not required to meet the Plans' Tier 1 investment requirements. *ABB Issue 5.*..................................................................................52

    C.  Eliminating Wellington investments and putting them into Fidelity's Freedom Funds was a prohibited transaction. *ABB Issue 6.* ......................53

    D.  This claim is not barred by ERISA's six-year statute of limitations. *ABB Issue 4.*................................................................................56

    E.  The Plans lost $21.8 million. *ABB Issue 7.* ..................................................62

III.   ABB breached its fiduciary duties by putting higher-cost share classes of mutual funds in the Plans to benefit itself.................................................64

IV.   Fidelity breached its fiduciary duties by retaining float income from plan assets, causing Plan losses of $1.7 million. ...........................................67

    A.  Fidelity's arguments that float is not a plan asset have no merit. *Fidelity Issue 1.*................................................................................67

    B.  This claim is not barred by ERISA's six-year statute of limitations. *Fidelity Issue 2.*................................................................................73

    C.  The Plans lost $1.7 million. *Fidelity Issue 3.* ...........................................75

        1.  Fidelity failed to prove any benefit to the Plans from its float program................................................................................77

        2.  Fidelity provided no evidence of any tax withholding that should have been deducted from the calculation of Plan losses.......................78

V.    The district court awarded reasonable attorney fees that were a fraction of Defendants' fees. ...........................................................................79

    A.  The district court properly awarded a national billing rate. *ABB Issue 12.*................................................................................81

    B.  The district court properly held ABB and Fidelity jointly and severally liable for Plaintiffs' attorney fees. *Fidelity Issue 4.*......................84

Appellate Case: 12-2060    Page: 4    Date Filed: 05/15/2013 Entry ID: 4035705

Conclusion ...................................................................................................88

Certificates of Compliance .......................................................................90

Certificate of Service ...............................................................................91

Appellate Case: 12-2060     Page: 5     Date Filed: 05/15/2013 Entry ID: 4035705

# TABLE OF AUTHORITIES

## Cases

29 U.S.C. §1106.................................................................................54

*Acosta v. Pac. Enterprises*,
   950 F.2d 611 (9th Cir. 1991)..................................................... 53, 69

*Adamson v. Armco, Inc.*,
   44 F.3d 650 (8th Cir. 1995).........................................................74

*Amato v. W. Union Int'l, Inc.*,
   773 F.2d 1402 (2d Cir. 1985).......................................................54

*Anderson v. Bessemer City*,
   470 U.S. 564 (1985) ...................................................................18

*Angell v. John Hancock Life Ins. Co.*,
   421 F.Supp.2d 1168 (E.D.Mo. 2006), *aff'd*, 223 Fed.Appx. 527 (8th Cir.
   2007)(per curiam)......................................................................74

*Armstrong v. LaSalle Bank N.A.*,
   446 F.3d 728 (7th Cir. 2006).......................................................33

*Associates in Adolescent Psychiatry, S.C. v. Home Life Insurance Co.*,
   941 F.2d 561 (7th Cir. 1991).......................................................72

*Blanton v. Anzalone*,
   760 F.2d 989 (9th Cir. 1985).......................................................57

*Boeckman v. A.G. Edwards Inc.*,
   461 F.Supp.2d 801 (S.D.Ill. 2006)..............................................61

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009).......................... 24, 31, 32, 38, 39, 57

*Brock v. Citizens Bank of Clovis*,
   841 F.2d 344 (10th Cir. 1988) ....................................................54

*Browning v. Tiger's Eye Benefits Consulting*,
   313 Fed.Appx. 656 (4th Cir. 2009)..............................................57

Appellate Case: 12-2060      Page: 6      Date Filed: 05/15/2013 Entry ID: 4035705

*Buccino v. Cont'l Assurance Co.*,
    578 F.Supp. 1518 (S.D.N.Y. 1983)............................................................ 60, 61

*Bunch v. W.R. Grace & Co.*,
    555 F.3d 1 (1st Cir. 2009) ...........................................................................33

*Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*,
    259 F.3d 1036 (9th Cir. 2001) ............................................................. 25, 63

*Chi. Prof'l Sports Ltd. P'ship v. N.B.A.*,
    1996 U.S. Dist. LEXIS 1525 (N.D.Ill. Feb. 13, 1996) ...............................83

*Christensen v. Harris County*,
    529 U.S. 576 (2009) ....................................................................................25

*Coats v. Penrod Drilling Corp.*,
    61 F.3d 1113 (5th Cir. 1995)(en banc) .....................................................84

*Commonwealth Edison Co. v. Vega*,
    174 F.3d 870 (7th Cir. 1999)......................................................................68

*Concord Boat Corp. v. Brunswick Corp.*,
    309 F.3d 494 (8th Cir. 2002), *amended*, 318 F.3d 1156 (2003)............. 84, 88

*Conkright v. Frommert*,
    559 U.S. 506, 130 S.Ct. 1640 (2010)........................................................32

*Cox v. Zurn Pex, Inc.*,
    644 F.3d 604 (8th Cir. 2011).............................................................. 43, 44

*Dardaganis v. Grace Capital, Inc.*,
    889 F.2d 1237 (2d Cir. 1989).....................................................................25

*David E. Watson, P.C. v. United States*,
    668 F.3d 1008 (8th Cir. 2012) ...................................................................43

*David v. Alphin*,
    704 F.3d 327 (4th Cir. 2013)............................................................ 59, 60, 61

*David v. Alphin*,
    817 F.Supp.2d 764 (W.D.N.C.), *aff'd*, 704 F.3d 327 (2013)................. 59, 60

Appellate Case: 12-2060     Page: 7     Date Filed: 05/15/2013 Entry ID: 4035705

*Delaware State College v. Ricks*,
   449 U.S. 250 (1980) ................................................................57

*Dependahl v. Falstaff Brewing Corp.*,
   653 F.2d 1208 (8th Cir. 1981) ...................................... 80, 83

*Dobson v. Hartford Fin. Servs. Group, Inc.*,
   2002 U.S. Dist. LEXIS 17682 (D.Conn. Aug. 2, 2002) ....................................81

*Donovan v. Bierwirth*,
   680 F.2d 263 (2d Cir. 1982)........................................... 24, 53, 63, 76

*Donovan v. Mazzola*,
   716 F.2d 1226 (9th Cir. 1983) ......................................32

*Emery v. Hunt*,
   272 F.3d 1042 (8th Cir. 2001) ......................................83

*Evans v. Bexley*,
   750 F.2d 1498 (11th Cir. 1985) .....................................54

*Faber v. Metropolitan Life Insurance Co.*,
   648 F.3d 98 (2d Cir. 2011)........................................... 72, 73

*Farmers Coop. Co. v. Senske & Son Transfer Co.*,
   572 F.3d 492 (8th Cir. 2009).........................................83

*Fenster v. Tepfer & Spitz, Ltd.*,
   301 F.3d 851 (7th Cir. 2002)........................................84

*Firestone Tire & Rubber Co. v. Bruch*,
   489 U.S. 101 (1989)................................................... 32, 34, 35

*FirsTier Bank N.A. v. Zeller*,
   16 F.3d 907 (8th Cir. 1994)..........................................59

*Fish v. St. Cloud State Univ.*,
   295 F.3d 849 (8th Cir. 2002).........................................83

*Fox v. Vice*,
   131 S.Ct. 2205 (2011) ............................................... 79, 88

Appellate Case: 12-2060    Page: 8    Date Filed: 05/15/2013 Entry ID: 4035705

*George v. Kraft Foods Global, Inc.*,
641 F.3d 786 (7th Cir. 2011)........................................................ 31, 39, 42, 68, 71

*Gonzalez v. United States*,
681 F.3d 949 (8th Cir. 2012)................................................................ 47, 64, 78

*Grindstaff v. Green*,
133 F.3d 416 (6th Cir. 1998)........................................................................ 53, 69

*Hackett v. Standard Ins. Co.*,
559 F.3d 825 (8th Cir. 2009)................................................................................32

*Hecker v. Deere & Co.*,
556 F.3d 575, *supplemented*, 569 F.3d 708 (7th Cir. 2009) ............. 30, 37, 38, 65

*Henson v. Columbus Bank & Trust Co.*,
770 F.2d 1566 (11th Cir. 1985) ........................................................................83

*In re Unisys Savings Plan Litig.*,
173 F.3d 145 (3d Cir. 1999)......................................................... 31, 32, 33, 34

*Jensen v. SIPCO, Inc.*,
38 F.3d 945 (8th Cir. 1994)..................................................................................23

*John Blair Communs., Inc. Profit Sharing Plan v. Telemundo Group, Inc.
Profit Sharing Plan*,
26 F.3d 360 (2d Cir. 1994).............................................................................. 31, 32

*Kaffenberger v. United States*,
314 F.3d 944 (8th Cir. 2003)...............................................................................79

*Kalda v. Sioux Valley Physician Partners, Inc.*,
481 F.3d 639 (8th Cir. 2007).............................................................................69

*Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*,
555 U.S. 285 (2009) ...........................................................................................23

*Khoury v. Philips Med. Sys.*,
614 F.3d 888 (8th Cir. 2010)...............................................................................40

*Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*,
173 F.3d 313 (5th Cir. 1999)...............................................................................25

Appellate Case: 12-2060    Page: 9    Date Filed: 05/15/2013 Entry ID: 4035705

*Larson v. Northrop Corp.*,
  21 F.3d 1164 (D.C. Cir. 1994) ................................................................58

*LaRue v. DeWolff, Boberg & Assocs.*,
  552 U.S. 248 (2008) ...........................................................................1

*Leigh v. Engle*,
  727 F.2d 113 (7th Cir. 1984)................................................ 53, 54, 76, 79

*Leister v. Dovetail, Inc.*,
  546 F.3d 875 (7th Cir. 2008).................................................................63

*Leonard v. Southwestern Bell Corp. Disability Income Plan*,
  408 F.3d 528 (8th Cir. 2005).................................................................85

*Librizzi v. Children's Mem. Med. Ctr.*,
  134 F.3d 1302 (7th Cir. 1998) ..............................................................57

*Little Rock Sch. Dist. v. Arkansas*,
  664 F.3d 738 (8th Cir. 2011)................................................ 40, 53, 82, 83

*Lockheed Martin Corp. v. Spink*,
  517 U.S. 882 (1996)............................................................................55

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011)................................................... 35, 37, 38

*Lowen v. Tower Asset Mgmt., Inc.*,
  829 F.2d 1209 (2d Cir. 1987)................................................................53

*Mahoney v. J.J. Weiser & Co.*,
  564 F.Supp.2d 248 (S.D.N.Y. 2008)......................................................61

*Marmo v. Tyson Fresh Meats, Inc.*,
  457 F.3d 748 (8th Cir. 2006)...................................................... 43, 44

*Martin v. Caterpillar, Inc.*,
  No. 07-1009, Doc. 197 (C.D.Ill. Sep. 10, 2010)......................................79

*Martin v. Consultants & Admin'rs, Inc.*,
  966 F.2d 1078 (7th Cir. 1992) ..............................................................60

Appellate Case: 12-2060    Page: 10    Date Filed: 05/15/2013 Entry ID: 4035705

*Martin v. Feilen*,
    965 F.2d 660 (8th Cir. 1992)............................................................ 32, 47, 63, 76

*Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*,
    401 F.3d 901 (8th Cir. 2005)............................................................44

*Metavante Corp. v. Emigrant Sav. Bank*,
    619 F.3d 748 (7th Cir. 2010).......................................................... 43, 44

*Moench v. Robertson*,
    62 F.3d 553 (3d Cir. 1995)...............................................................34

*Mogck v. Unum Life Ins. Co. of Am.*,
    289 F.Supp.2d 1181 (S.D.Cal. 2003)................................................81

*Overton v. United States*,
    619 F.2d 1299 (8th Cir. 1980) .........................................................47

*Perdue v. Kenney A. ex rel. Winn*,
    130 S.Ct. 1662 (2010).....................................................................82

*Phillips v. Alaska Hotel & Rest. Employees Pension Fund*,
    944 F.2d 509 (9th Cir. 1991)........................................................... 58, 74

*Planned Parenthood, Sioux Falls Clinic v. Miller*,
    70 F.3d 517 (8th Cir. 1995)..............................................................82

*Quinn v. St. Louis County*,
    653 F.3d 745 (8th Cir. 2011).............................................................67

*Radford v. Gen. Dynamics Corp.*,
    151 F.3d 396 (5th Cir. 1998)........................................................... 57, 58

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011)............................................................ 37, 38

*Robinson v. GEICO Gen. Ins. Co.*,
    447 F.3d 1096 (8th Cir. 2006) ........................................................ 43, 44

*Roth v. Sawyer-Cleator Lumber Co.*,
    61 F.3d 599 (8th Cir. 1995).............................................................. 76, 78

Appellate Case: 12-2060   Page: 11   Date Filed: 05/15/2013 Entry ID: 4035705

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ...................................................................................25

*Snider v. United States*,
   468 F.3d 500 (8th Cir. 2006) ......................................................................79

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931) ...................................................................................63

*Story v. Norwood*,
   659 F.3d 680 (8th Cir. 2011) .............................................. 18, 28, 29, 36, 37, 42

*Struble v. N.J. Brewery Employees' Welfare Trust Fund*,
   732 F.2d 325 (3d Cir. 1984) ............................................................... 31, 34

*Taylor Corp. v. Four Seasons Greetings, LLC*,
   403 F.3d 958 (8th Cir. 2005) .............................................. 18, 28, 29, 36, 37, 42

*Tibble v. Edison Int'l*,
   711 F.3d 1061, 2013 U.S. App. LEXIS 5598 (9th Cir. Mar. 21, 2013) ....... 34, 62

*Torgeson v. Unum Life Ins. Co. of Am.*,
   2007 U.S. Dist. LEXIS 9332 (N.D.Iowa Feb. 5, 2007) ......................................81

*Walker v. U.S. Dept. of H.U.D.*,
   99 F.3d 761 (5th Cir. 1996) ........................................................... 84, 88

*Waters v. Int'l Precious Metals Corp.*,
   190 F.3d 1291 (11th Cir. 1999) ........................................................80

*Whitfield v. Cohen*,
   682 F.Supp. 188 (S.D.N.Y. 1988) ..............................................................61

*Will v. Gen. Dynamics, Corp.*,
   No. 06-698, Doc. 259 (S.D.Ill. Nov. 22, 2010) ..................................................79

**Statutes**

29 U.S.C. §1002(1) ..........................................................................................6

29 U.S.C. §1002(21)(A)(i) ...............................................................................59

29 U.S.C. §1002(21)(B) ...................................................................................55

Appellate Case: 12-2060    Page: 12    Date Filed: 05/15/2013 Entry ID: 4035705

29 U.S.C. §1002(7) ................................................................................2

29 U.S.C. §1003(b)(1) ...........................................................................42

29 U.S.C. §1101(b)(1) ...........................................................................55

29 U.S.C. §1102(a)(1) ........................................................................ 3, 23

29 U.S.C. §1102(a)–(b) ..........................................................................23

29 U.S.C. §1102(c) .................................................................................23

29 U.S.C. §1103(a) ............................................................................ 3, 59

29 U.S.C. §1104(a) .......................................................................... 24, 59

29 U.S.C. §1104(a)(1) .......................................... 1, 28, 29, 46, 49, 64, 65

29 U.S.C. §1104(a)(1)(A) ............................................... 3, 5, 28, 46

29 U.S.C. §1104(a)(1)(B) ................................................... 24, 42

29 U.S.C. §1104(a)(1)(D) ..................................... 22, 23, 25, 28, 47, 49, 50

29 U.S.C. §1105(a) .................................................................................59

29 U.S.C. §1106(a)(1)(D) .............................................. 53, 54, 55

29 U.S.C. §1108(b)(6) ............................................................................69

29 U.S.C. §1109(a) .................................................................................24

29 U.S.C. §1113 .................................................... 56, 57, 61, 62, 74

29 U.S.C. §1132(a)(1)(B) ................................................ 24, 32, 74

29 U.S.C. §1132(a)(2) .............................................................................24

29 U.S.C. §1132(g)(1) ...................................................... 17, 84

Minn. Stat. §541.07 ................................................................................74

**Regulations**

17 C.F.R. §270.12b-1 ...............................................................................4

Appellate Case: 12-2060    Page: 13    Date Filed: 05/15/2013 Entry ID: 4035705

29 C.F.R. §2509.08-2(2) (2008) ...........................................................25

29 C.F.R. §2510.3-101 .......................................................................68

29 C.F.R. §2510.3-102 .......................................................................68

29 C.F.R. §2550.404c-5 ......................................................................52

**Rules**

8th Cir. R. 47B ..................................................................................75

Fed.R.Civ.P. 52(a)(6).................................................. 18, 28, 29, 36, 37, 42

Fed.R.Civ.P. 54(d) .............................................................................84

**Other Authorities**

29 Wright & Gold, FED. PRACTICE & PROC. EVID. §6265 (1997) ...........................44

Br. of Acting Sec'y of Labor as *Amicus Curiae*, *David v. Alphin*, 704 F.3d 327
(4th Cir. Feb. 28, 2013)....................................................................62

Br. of Sec'y of Labor as *Amicus Curiae*, *David v. Alphin*, 704 F.3d 327 (4th
Cir. Dec. 28, 2011)..........................................................................62

Br. of Sec'y of Labor as *Amicus Curiae*, *Tibble v. Edison*, 711 F.3d 1061 (9th
Cir. May 25, 2011)..........................................................................62

David L. Scott, Wall Street Words 152 (3d ed. 2003).......................................68

DOL Advisory Opinion 93-24A (Sep. 13, 1993),
http://www.dol.gov/ebsa/programs/ori/advisory93/93-24a.htm.........................68

DOL Field Assistance Bulletin 2002-03 (Nov. 5, 2002),
http://www.dol.gov/ebsa/regs/fab2002-3.html. ....................................71

DOL Information Letter (Aug. 11, 1994),
http://www.dol.gov/ebsa/regs/ILs/il081194.html. .............................. 68, 69, 71

Thomas P. Fitch, Dictionary of Banking Terms 198 (5th ed. 2006) .....................68

Appellate Case: 12-2060     Page: 14     Date Filed: 05/15/2013 Entry ID: 4035705

# INTRODUCTION

For decades, most American workers retired with a guaranteed income through an employer-provided defined benefit plan. That time has passed for most American workers, including ABB's. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Instead, most workers today have a plan where a percentage of their wages is contributed to a retirement account. Beyond the amount contributed by employer and employee, the amount available at retirement is completely a function of the success or failure of the employee's investments and fees. With defined contribution plans, which have become America's retirement system, *id.*, there is no guaranteed income upon retirement.

This later approach to retirement shifts the risk of retirement income from the employer to the employee, who depends on her employer as fiduciary on the employee's behalf. The employee can select *only* from the investment options chosen by her employer. Further, the employee has no control over the costs that she will pay; those costs are controlled by the employer.

ERISA requires that the employer, when acting as a fiduciary, do so prudently, loyally, and for the exclusive benefit of the employee. 29 U.S.C. §1104(a)(1). At its heart, this lawsuit is about Defendants' flagrant failure to properly execute these fiduciary duties and responsibilities. The district court found Defendants' "suspicious relationship" culminated in "blatant" and "egregious" breaches of

Appellate Case: 12-2060    Page: 15    Date Filed: 05/15/2013 Entry ID: 4035705

fiduciary duties and prohibited transactions, resulting from Defendants' repeated use and operation of Plaintiffs' 401(k) retirement plans for Defendants' benefit at the expense of ABB's employees in multiple ways, as the district court detailed in its lengthy and thorough Order. FDA307, FDA319, FDA333, FDA347, FDA361.

Rather than satisfying their fiduciary duties, Defendants operated the ABB 401(k) plans for their own benefit by leveraging the plans to gain corporate discounts and free services. These were the findings and conclusions of the district court after a four-week bench trial from January 5 through 28, 2010, and after extensive and deliberate consideration of nearly 4,000 transcript pages of testimony and argument and nearly 400 exhibits. The judgment should be affirmed.

## STATEMENT OF FACTS

### I.    The PRISM Plans and the ABB Defendants.

ABB Inc. maintained two individual account, defined contribution plans governed by ERISA, called the Personal Retirement Investment and Savings Management Plans (PRISM). Plaintiffs represent a class of all current and former participants and beneficiaries in the Plans. FDA123–45; 29 U.S.C. §1002(7). Plan participants could invest their individual accounts only in the options that their Plan fiduciaries provided. Those fiduciaries also controlled Plan expenses and the allocation of those expenses to Plan participants.

The Pension Review Committee (PRC) and the Employee Benefits Committee

Appellate Case: 12-2060    Page: 16    Date Filed: 05/15/2013 Entry ID: 4035705

(EBC) of ABB Inc.'s Board of Directors are the named fiduciaries of the Plans. 29 U.S.C. §1102(a)(1), §1103(a); ASA205–348. The PRC was responsible for Plan investments. ASA222, ASA288. The EBC was responsible for Plan administration. ASA218, ASA285. The EBC also oversaw all of the other employee benefits programs ABB maintained, including ABB's defined benefit plan and special plans for highly compensated employees. SA85, SA213;[1] Tr. 122:4–24.

The Pension & Thrift Investment Management group (PTM) was a department of ABB Inc. that served as the staff of the PRC and was responsible for making recommendations to the PRC on Plan investments and hiring managers of Plan investment options. SA257; Tr. 858:17–21; Tr. 980:15–19; Tr. 129:20 – 130:1. John Cutler was the Director of the PTM. Tr. 848:13 – 849:1. ABB Inc., the EBC, the PRC, the PTM, and Cutler are all defendants, collectively referred to by the district court and herein as ABB. FDA302.

## II.  Plan recordkeeping fees and mutual fund revenue sharing.

Plan fiduciaries must ensure that employee retirement plans pay only "reasonable expenses of administering the plan." 29 U.S.C. §1104(a)(1)(A)(ii). One plan administrative expense is recordkeeping—maintaining accounts for individual participants, tracking account transactions, handling directions from participants, and distributing information to participants. SA186, SA122–24,

---

[1] Separate Appendix of Plaintiffs-Appellees.

Appellate Case: 12-2060    Page: 17    Date Filed: 05/15/2013 Entry ID: 4035705

FDA441–47. Recordkeeping is a commodity service that exists in a highly competitive market, particularly for large plans such as ABB's. Tr. 138:18–24; 1302:18–24; 3410:2–8; 3373:7 – 3374:1. A recordkeeper's costs vary by the number of participants, not by the amount of money in participant accounts. Tr. 1302:12–17, 1320:14–18. Compensation to a recordkeeper typically is arranged on a fixed-fee or asset-based fee basis. Tr. 1303:8–16.

Total recordkeeping fees for a Plan often are negotiated at a fixed dollar amount. Tr. 1301:22-1302:5, 1302:25–1303:7. The total recordkeeping fee then can be allocated by plan fiduciaries to each participant account on a per capita (fixed-fee) basis or on the basis of total plan assets (asset-based). Tr. 1302:25 – 1303:18; SA595. In a fixed-fee arrangement, the fee is set and will not vary depending on the size of plan assets or individual participant accounts. Tr. 1303:8–10. With an asset-based fee, if the fee is not capped, the recordkeeping fee increases with plan asset values, even though no additional recordkeeping services are being provided. Tr. 1303:16–18; SA592, SA619; Tr. 3636:20 – 3637:2.

Some mutual funds give plan recordkeepers a portion of the annual asset-based expense ratios plan participants pay for investment in the mutual funds. This is "revenue sharing." *See* 17 C.F.R. §270.12b-1; SA73; Tr. 1264:12 – 1265:18. Prudent fiduciaries must ensure that a plan recordkeeper receives only reasonable recordkeeping compensation from revenue sharing; any excess must be returned to

Appellate Case: 12-2060    Page: 18    Date Filed: 05/15/2013 Entry ID: 4035705

plan participants. Tr. 1306:1–6, 1310:1–5, 1307:7 – 1308:9, 1502:11–21, 1609:8–20; 29 U.S.C. §1104(a)(1)(A).

## III.  The mutual benefits of the Fidelity and ABB relationship.

ABB hired Fidelity to provide recordkeeping and trustee services for the Plans in 1995.[2] ASA349–465; *see* 29 U.S.C. §1103(a). ABB obligated the Plans to pay Fidelity a small per-participant recordkeeping fee as well as revenue sharing from certain mutual funds. ASA375, ASA414. Although the trust agreement did not provide for revenue sharing from participant investments in Fidelity mutual funds, *id.*, Fidelity received such revenue sharing, SA242. Four Fidelity mutual funds were included in the Plans. ASA370. No caps or limits were placed on the amount of money Fidelity received from revenue sharing. ASA375, ASA414. The fixed-fee in both Plans was later replaced by much higher, open-ended revenue sharing fees, and more Fidelity mutual funds, and other mutual funds that agreed to pay Fidelity revenue sharing, were added as Plan investments. ASA441–42, ASA451, ASA458–59, ASA464, ASA812–15. As the Plans' mutual fund assets grew, Fidelity's uncapped, asset-based revenue sharing fees sky-rocketed. Tr. 198:20 – 199:21; ASA883.

As Fidelity's uncapped fees from the Plans grew, Fidelity's corporate business with ABB grew. ABB hired Fidelity to provide recordkeeping for fifteen of ABB's

---

[2] Distinction among particular Fidelity entities is not relevant in this appeal. They are collectively referred to as Fidelity. *See* FDA302.

Appellate Case: 12-2060     Page: 19     Date Filed: 05/15/2013 Entry ID: 4035705

defined benefit (DB) plans. SA525, SA543–44. Then ABB hired Fidelity to provide recordkeeping for hundreds of ABB's health and welfare plans and expanded the number of DB plans serviced by Fidelity to 47. SA479, SA520–22, SA475; *see* 29 U.S.C. §1002(1). ABB was responsible for paying for these corporate services. SA483, SA511–16, SA525, SA527, SA538–42. These corporate services were provided by Fidelity at a loss and were provided only because of the high profitability of the recordkeeping fees in the PRISM Plans and because it was Fidelity's "practice to look at the overall relationship with the client since engaging in multiple services with a client solidifies the relationship and keeps the client from going out to bid in the future." SA473, SA550, SA557, SA68–69 (¶¶ 19–20); Tr. 3478:6–9, 3443:17 – 3445:17; SA410–13. Fidelity noted, "Our relationship with ABB has grown enormously." SA408; Tr. 655:17 – 656:3.

Fidelity also provided recordkeeping and administration for ABB's Restoration Plan, a retirement plan for highly compensated ABB executives. SA544; Tr. 122:4–24. Although the cost to Fidelity of administering the executives' Restoration Plan alone was over $100,000, SA541, Fidelity provided those services to ABB's executives *for free*. Tr. 3308:17 – 3310:5; SA192.

## IV.  The PRISM Plans' Investment Policy Statement.

John Cutler, Director of the PTM, recognized that it was his "duty to see to it that fees for each service in the PRISM Plans are reasonable." Tr. 848:15–16,

Appellate Case: 12-2060    Page: 20    Date Filed: 05/15/2013 Entry ID: 4035705

853:21 – 854:16. In 2000, Cutler drafted an Investment Policy Statement (IPS) for the Plans. Tr. 866:2-21. The IPS provided specific criteria for the selection, monitoring, and removal of the investment options in the Plans. ASA489–90, ASA497–98. The IPS also contained a provision to limit Fidelity's uncapped revenue sharing fees by requiring that revenue sharing from Plan mutual fund investments be used to "offset or reduce" Plan administrative expenses. This provision was the "Alliance Rebate" requirement:

> Alliance Rebates: The Committee recognizes that ABB may employ a record-keeper that has a strategic alliance with one or more fund managers. These alliances provide rebates to the cost of administration (including record-keeping). At all times, these rebates will be used to offset or reduce the cost of providing administrative services to plan participants.

ASA491, ASA499; SA73. Further, the IPS required Plan fiduciaries to use the Plans' asset size to the participants' advantage in selecting the lowest cost form of investment:

> To the extent possible, ABB will use the purchasing power afforded by the size of plan assets to reduce the cost to participants of providing the Plans' investment options. When a selected mutual fund offers ABB a choice of share classes, ABB will select that share class that provides plan participants with the lowest cost of participation.

SA182; ASA497. The PRC unanimously adopted the IPS. ASA484–86. Cutler also obtained a written opinion letter from the Plans' outside counsel confirming that ABB had to comply with the IPS "and that a failure to follow the [IPS] would be a breach of fiduciary duty." SA243, SA246; Tr. 957:20–22.

Appellate Case: 12-2060     Page: 21     Date Filed: 05/15/2013 Entry ID: 4035705

## V.    Cutler's thwarted attempt to enforce the IPS, and ABB's enhancement of its corporate benefits at the cost of the PRISM Plans

In September 2000, Cutler began identifying mutual funds to add to the Plans under the newly adopted IPS. He and John Sackie (ABB V.P. of Human Resources until 2004) met with Fidelity to discuss the "pricing implications" of that process. ASA502; Tr. 110:4–25. At that time Fidelity was receiving uncapped asset-based revenue sharing from Plan mutual funds and a small per-participant fee. ASA375. Cutler told Fidelity about funds "to be added to [the Plan] effective 3-31-01." ASA503–04. Consistent with the "Alliance Rebate" provision in the IPS, Cutler stated his desire to meet personally with those fund managers and "establish[] an agreement and a possible rebate to be paid to ABB's PRISM Plan for the assets going to these funds." ASA504.

Fidelity pointed out the "*financial incentives to ABB*" if more assets in the Plan were moved to Fidelity mutual funds. FDA337–38 (emphasis added); ASA502; Tr. 169:13 – 172:20, 306:13 – 307:4. Fidelity identified one investment of particular interest—the Vanguard Wellington Fund, in which participants had invested over $120 million and which paid no revenue sharing to Fidelity. ASA845; ASA812. Fidelity proposed that if participant investments in Wellington were forcibly transferred (or "mapped") to Fidelity's Freedom Funds, the remaining per-participant fee would be replaced entirely with the asset-based revenue sharing method of compensating Fidelity. ASA502. Fidelity's Freedom Funds gave

Appellate Case: 12-2060     Page: 22     Date Filed: 05/15/2013 Entry ID: 4035705

Fidelity's recordkeeping subsidiary uncapped revenue sharing. SA242.

Fidelity also contacted managers of the proposed non-Fidelity funds to get revenue sharing. ASA505. Cutler objected to Fidelity interfering with ABB's efforts to obtain revenue sharing rebates for the Plans, noting, "I am particularly interested in negotiating with fund providers re rebates" and "it is CRITICAL that ABB negotiate these separate from Fidelity." SA256. Sackie, however, intervened, noting, "we have to be careful here." *Id.*

> We'll find ourselves 'squeezing the balloon'. In other words they will give us the rebates and impose a recordkeeping charge. I'd rather have the discussion with Joe D. [of Fidelity] to see what is the best arrangement.

*Id.* Avoiding a fixed-fee recordkeeping charge was particularly important to Sackie because he was responsible for "signing off" on any such fees in the Plans. Tr. 187:25 – 188:1. Although Sackie "was not familiar with rebates" and Cutler had "expertise" in that area, Sackie "had responsibility for the relationship with Fidelity." Tr. 181:21–23. Sackie was one of the ABB executives who participated in ABB's Restoration Plan, for which Fidelity provided free services. Tr. 123:5–7. Describing Sackie, Fidelity stated, "ABB's primary decision maker was instrumental in bringing this multipractice relationship to Fidelity (DC, DB & H&W)" and "a valued (referenceable) senior contact[.]" SA470; Tr. 233:9–21.

Sackie's "best arrangement", which Cutler and the PRC implemented in 2001, was to have the Plans remove the Wellington Fund and forcibly transfer all

Appellate Case: 12-2060    Page: 23    Date Filed: 05/15/2013 Entry ID: 4035705

participant investments in that Fund into five Fidelity Freedom Funds. ASA812–14, ASA508–10; SA386–87; SA256; FDA478; FDA351–52. He also had the Plans add another Fidelity mutual fund and fifteen other mutual funds, all of which paid revenue sharing to Fidelity. *Id.* Eventually, all participants who failed to make an investment selection were automatically placed into Fidelity's Freedom Funds. SA143. Wellington was removed despite its stellar performance in four of the previous five years; with "scant" research by Cutler; and with only "cursory" review by the PRC. FDA338–39, FDA347; ASA526; SA182–83; Tr. 897:24 – 898:3, 2608:5–23; ASA485; ASA508. Fidelity received all the revenue sharing from the new funds. ASA504; Tr. 912:6–10; SA381; SA400–01; SA242. Replacing explicit per-participant recordkeeping fees with significantly enhanced, uncapped, and hidden revenue sharing made Plan costs "opaque" and made the Plans appear to be free for employees. FDA321, FDA338, FDA340, FDA347; SA232; Tr. 603:23 – 604:13; SA256; SA231.

ABB secured this new "arrangement" for Fidelity by adding in 2001 a "revenue neutral" provision to Fidelity's contract, by which ABB allowed Fidelity to revise its compensation if any revenue-sharing fund were removed from the Plans. FDA354; ASA442. As of 2002, the Plans proved to be highly profitable for Fidelity, providing a 54% profit margin. SA471.

Shortly after Sackie's "best arrangement" was in place, he had Fidelity service

Appellate Case: 12-2060     Page: 24     Date Filed: 05/15/2013 Entry ID: 4035705

another ABB executive compensation plan "to save money at ABB and to consolidate administration." SA470. Because of the "current profitability" of the PRISM Plans, Fidelity waived the upfront cost of $49,000 and waived the annual ongoing costs of $12,000–$15,000. *Id*. These fees were waived so that Fidelity would "get some credit from [ABB]." *Id*. With the 2004 addition of human resource and payroll services that Fidelity provided to ABB, ABB became "a four practice client" of Fidelity, "one of seven 4 product" Fidelity "clients" out of the more than one hundred large defined contribution clients served by Fidelity. SA408, SA549, SA561. At this point, Fidelity enjoyed a 56% profit margin from the PRISM Plans. SA408; Tr. 3444:14–18. Fidelity received "Well Above" market fees from the Plans through the uncapped revenue sharing arrangement. SA557. This 56% profit on the employees' assets was used to provide the below market fees that Fidelity charged ABB at a loss. SA550, SA557; FDA360–61; SA80; Tr. 3478:6-9; SA410–13. Fidelity recognized ABB as "a client who is very interested in creating 'win-win' scenarios." SA409.

Plan participants were not the winners. Fidelity's revenue sharing came out of the fees deducted from participants' mutual fund investments every year, which decreased their investment returns and their retirement savings. During this entire time period ABB "never calculated the dollar amount of recordkeeping fees the Plan paid to Fidelity Trust" through revenue sharing. FDA319; Tr. 161:20–24,

Appellate Case: 12-2060    Page: 25    Date Filed: 05/15/2013 Entry ID: 4035705

354:11– 355:3, 371:13 – 372:6, 860:18 – 861:6, 861:21– 862:2, 2293:11–22. Instead, it continually exploited this arrangement for Fidelity's and its own benefit.

When ABB selected new mutual funds to include in the Plans, it had a choice as to which share class of those mutual funds to select. SA573–75; Tr. 1354:4–16. One share class paid Fidelity revenue sharing, but charged participants higher fees. One share class did not pay Fidelity revenue sharing and charged participants lower fees. *Id.* ABB selected the higher-fee share class of these mutual funds, *id.*, despite the requirement in the IPS that, "When a selected mutual fund offers ABB a choice of share classes, ABB will select that share class that provides Plan participants with the lowest cost of participation." ASA497; FDA355–56; SA182.

In 2004, ABB decided to remove Fidelity's Magellan Fund from the Plans. SA73. In selecting replacements ABB again sought to benefit Fidelity and itself at the cost of Plan participants. Fidelity informed ABB that if Fidelity did not get sufficient revenue sharing payments from any replacement mutual funds it would reinstitute a disclosed per-participant fee, and services such as the free executives' plan "would be done in the future on a 'fee for service' basis." SA196, SA547. But if Fidelity got revenue sharing "there would be no change whatsoever in [Fidelity's] fee arrangement. [Fidelity] would continue to provide [] recordkeeping services at a $0 fee." SA196. Thus, ABB would continue to receive its preferential corporate services from Fidelity and be able to keep Plan expenses opaque only if

Appellate Case: 12-2060      Page: 26      Date Filed: 05/15/2013 Entry ID: 4035705

it maintained Fidelity's highly profitable revenue sharing stream in the PRISM Plans. FDA359; Tr. 385:23 – 386:7, 380:21 – 381:7; SA210.

In analyzing this choice, ABB consulted with Mercer Human Resource Consulting, who warned ABB that Plan administrative fees were substantially higher than the expected fee of $70 per participant, that Plan fees paid to Fidelity were likely subsidizing ABB's corporate services, and that the free non-qualified executive plans should be separately paid for, not "free." ASA903–06. Despite this warning and the "*disturbing implications of cross subsidization*," ABB "did nothing to obtain clarification or address the problem." FDA360 (emphasis added); Tr. 643:16–23; 627:9–17. Instead, ABB negotiated advantageous terms for additional corporate services and the renewal of its existing Fidelity-sponsored services and free executive plan services. SA414–32; SA196; SA234; SA547. In fact, ABB and Fidelity actively negotiated the PRISM Plans' fees against the free executive plans. SA200; SA196; SA203–04. ABB also synchronized the renewal dates of Fidelity's contracts for services on the PRISM Plans and the corporate services. SA205; SA234; Tr. 460:22 – 461:16, 462:10–22, 610:14–25. That allowed better coordination of the cross-subsidization between the PRISM Plans and ABB corporate services. ABB and Fidelity thus met their goals of making the transition from Magellan revenue neutral for Fidelity and ensuring continued free and low-cost corporate services for ABB. FDA326, FDA354–62.

Appellate Case: 12-2060    Page: 27    Date Filed: 05/15/2013 Entry ID: 4035705

## VI.    Fidelity's earning of float interest on Plan assets.

In addition to being the recordkeeper, Fidelity was the PRISM Plan trustee, with custody over Plan assets. FDA367, FDA420–509.  In addition to the excessive recordkeeping fees Fidelity took from the Plans, Fidelity also made money directly from Plan assets, through the use of float. When contributions to the Plans were made, ABB deducted Plan contributions from its account and delivered that money to Fidelity. FDA367, Tr. 1181:10–15, 1206:2–10. Fidelity eventually allocated that contribution according to the participant's directions, but between the time that Fidelity received the money from ABB and the time that the investment fund received the participant-directed allocation, Fidelity kept the money in its own account and earned interest from it. FDA367–70; Tr. 1179:5 – 1183:14. Similarly, when distributions were made from participant accounts, Fidelity removed the money from Plans' trust account and held it in its own account and earned interest from it until the participant deposited the distribution check and the funds were drawn. FDA368–70, FDA271–79, FDA287–88. None of this was provided for in Fidelity's trust agreement. FDA446–47.

## VII.   The district court's judgment.

After careful and deliberate consideration of the voluminous evidence in this case, on March 31, 2012, the district court entered its order and judgment that Defendants breached their fiduciary duties and caused losses to the Plans of over

Appellate Case: 12-2060     Page: 28     Date Filed: 05/15/2013 Entry ID: 4035705

$36.9 million. ASA190–91; FDA302–82. The court found ABB and Fidelity breached their fiduciary duties in four specific respects.

1. ABB breached its duties by allowing Fidelity to receive unreasonable recordkeeping fees through the Plans' revenue sharing system for its own benefit. FDA316–32, FDA360–62. The court found ABB caused the Plans to suffer losses from this breach of $13.4 million, based upon the analysis of Plaintiffs' expert witness and evidence of a reasonable fee as shown in Fidelity's own documents, the consulting report Mercer provided to ABB, and a comparable retirement plan administered by one of Defendants' own expert witness. FDA322–25, FDA375–76. The court found that the damages due from ABB's unjust enrichment through the subsidization program, to which the Plans were entitled in restitution, were subsumed by its $13.4 million recordkeeping damages award. FDA379.

The court ordered ABB to put the Plans' recordkeeping contract out for competitive bidding, since it had not done so for over 15 years, and to negotiate a reasonable, market price for recordkeeping services. FDA380. If ABB chose to use revenue sharing to pay for recordkeeping, the court ordered ABB to determine the dollar amount of that revenue sharing and use the Plans' size to negotiate for rebates back to the Plans. *Id.* The court prohibited ABB from accepting any corporate services from the Plans' new recordkeeper. FDA380–81.

2. ABB breached its duties by removing the Wellington Fund for no legitimate

Appellate Case: 12-2060    Page: 29    Date Filed: 05/15/2013 Entry ID: 4035705

reason and moving all Wellington investments to Fidelity's Freedom Funds for the benefit of Fidelity and ABB. FDA333–53. ABB thereby caused the Plans to suffer losses of $21.8 million as a result of the underperformance of the Freedom Funds relative to the Wellington Fund. FDA376–77.

3. ABB breached its duties by selecting more expensive share classes of mutual funds that were added to the Plan. FDA353–57. The court, however, rejected Plaintiffs' arguments that Defendants breached their duties by failing to use separate accounts and commingled funds as Plan investment options. FDA363–67. The court also rejected Plaintiffs' global damage theory that ABB's conflicts so infected all of its investment decisions that Plan investment losses should be measured by comparison to the performance of ABB's defined benefit plan, where it had no such conflict. FDA306–07, FDA374, FDA379.

The court did not separately award damages for the share-class breaches because it found such damages were subsumed by the $13.4 million recordkeeping fee award. FDA378. The court did, however, order ABB to select the lowest-priced share class of any investment it considered for inclusion in the Plans. FDA381.

4. Fidelity breached its duties by retaining float income from Plan assets. FDA367–73. Fidelity thereby caused the Plans to suffer losses of $1.7 million, based on the testimony of Plaintiffs' expert witness and information provided by Fidelity's witness. FDA379–80. The court barred Fidelity from transferring any

Appellate Case: 12-2060     Page: 30     Date Filed: 05/15/2013 Entry ID: 4035705

such float income to any entity other than the Plans or Plan participants and beneficiaries, unless expressly permitted by the terms of a written agreement with the Plans. FDA381.

5. After further extensive briefing, ASA88–89, ASA91–96, ASA98, on November 2, 2012 the district court held Defendants jointly and severally liable for Plaintiffs' attorney fees under 29 U.S.C. §1132(g)(1) in the amount of $13 million, an amount that was under one-third of Defendants' fees. FDA390–411; CSA92,[3] CSA105.

---

[3] Confidential Separate Appendix of Plaintiffs-Appellees.

Appellate Case: 12-2060     Page: 31     Date Filed: 05/15/2013 Entry ID: 4035705

# SUMMARY OF THE ARGUMENT

The district court's judgment is stated in a factually intensive and detailed order. The legal conclusions that follow from those factual determinations are straight-forward and well-founded. The court's factual findings receive great deference. Fed.R.Civ.P. 52(a)(6). "The function of appellate courts is not to decide fact issues de novo, and as a reviewing court, we may not reverse the district court's fact findings 'simply because [we are] convinced [we] would have decided the case differently.'" *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 965 (8th Cir. 2005)(quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). The district court's "account of the evidence is plausible in light of the record viewed in its entirety"; therefore, "the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Story v. Norwood*, 659 F.3d 680, 685 (8th Cir. 2011) (quoting *Anderson*, 470 U.S. at 573–74). Defendants disregard these standards in essentially asking this Court to be a new trier of fact and attempting to convince this Court to weigh the evidence differently and altogether undo the district court's extensive, thorough analysis and conclusions in this nearly seven year old dispute. Defendants' appeals fail for these reasons.

I. The district court properly found ABB breached its duties by allowing Fidelity to receive excessive recordkeeping compensation through revenue sharing

Appellate Case: 12-2060    Page: 32    Date Filed: 05/15/2013 Entry ID: 4035705

in the amount of $13.4 million. The evidence clearly shows ABB's blatant conflict of interest in allowing Fidelity to receive these fees to benefit itself and altogether failing to monitor Fidelity's compensation. This excessive compensation violated the IPS and ERISA's strict fiduciary duties. The court's calculation of Plan losses was reasonable and based on substantial evidence, including Defendants' own evidence.

II. The district court properly found ABB breached its duties by moving all participant investments from the stellar-performing Wellington Fund into the untested Fidelity Freedom Funds for no prudent and loyal reason and in violation of the IPS. Instead, this move was part of ABB's conflict in benefitting Fidelity and itself through corporate services provided by Fidelity to ABB at a loss. This claim is not time-barred because the last action constituting a part of this breach— the transfer of participant investments—occurred within the limitations period. The court reasonably calculated Plan losses by comparing the Plans' performance in Fidelity's Freedom Funds to how they would have performed in the Wellington Fund.

III. The district court properly found ABB breached its duties by selecting higher-cost share classes of Plan mutual funds for the purpose of benefitting Fidelity, violating the IPS and ERISA's duties of loyalty and prudence.

IV. The district court properly found Fidelity breached its fiduciary duties by

Appellate Case: 12-2060    Page: 33    Date Filed: 05/15/2013 Entry ID: 4035705

earning income from Plan assets as they floated between accounts. Fidelity's argument under other legal theories that float was not a Plan asset fails in light of ERISA's and DOL's clear delineation of the plan asset status of funds from the point they leave the employer's account to the point they enter an investment fund's account or a distributee-participant's personal account. This claim was not time-barred because these breaches occurred within the limitations period. The court reasonably calculated Plan losses by relying on the testimony of Plaintiffs' expert witness and Fidelity's own witness.

V. The district court properly awarded Plaintiffs' attorneys fees that totaled only a small fraction of Defendants' attorneys' fees. The court awarded a blended hourly rate that was supported by substantial evidence and was reasonable. The court properly held Fidelity jointly liable for these fees because Fidelity breached its fiduciary duties and jointly defended this entire case with ABB and argued against the merits of the claims on which Plaintiffs succeeded.

Appellate Case: 12-2060    Page: 34    Date Filed: 05/15/2013 Entry ID: 4035705

# ARGUMENT

## I. ABB breached its fiduciary duties by causing the Plans to pay excessive recordkeeping fees and suffer losses of $13.4 million.

### A. ABB was motivated by conflicts of interest in generating revenues from the Plans for Fidelity. *ABB Issue 3.*

ABB completely misconstrues the blatant conflicts of interest that permeate this case. ABB Br. 26–31. The conflicts are not merely "bundling of investment management and recordkeeping services through a single provider" or using mutual funds. *Id.* at 26. Instead, they are fundamental conflicts, whereby ABB received direct benefits through subsidization of its corporate services and free services to ABB top executives from excessive fees Fidelity received from the PRISM Plans and also from being able to render Fidelity's recordkeeping fees "opaque." There is no question but that the PRISM Plans' excessively high fees subsidized the other corporate services Fidelity provided to ABB. Fidelity itself acknowledged that the PRISM fees it received were "well above" market, while the defined benefit, health and welfare, and HR fees were each "below" market. SA557; Tr. 3478:18 – 3479:17. Fidelity also acknowledged at trial that it was a breach of ERISA's duty of loyalty to exchange the high-profits in the PRISM Plans for the free executives' plans. Tr. 3466:8–15, 3398:14 – 3399:14. ABB's abuse of the PRISM Plans was so prevalent, ABB even had the Plans pay Fidelity's invoices for ABB's corporate services, which was only uncovered and rectified in the course of this lawsuit. Tr. 3546:20 – 3547:6; Docs. 437, 439.

Appellate Case: 12-2060    Page: 35    Date Filed: 05/15/2013 Entry ID: 4035705

ABB erroneously claims that the district court found ABB did not know of the cross-subsidization by the Plans of ABB's other corporate services until May 12, 2005. ABB Br. 30–31.The court, in fact, indicated it was "suspicious" of ABB's prior knowledge, but without proof of that knowledge, the court believed it could not hold ABB liable for unknowingly (until 2005) receiving free corporate services. FDA361–62. For the same reason—lack of proof of knowledge—the court did not hold Mr. Cutler, the PTM, the PRC, or Fidelity liable for the cross-subsidization breach. FDA362–63. Consequently, the court did not award any separate damages for this breach or award Plaintiffs' global damages theory. FDA78–79. This shows a very careful and deliberate process by the district court of applying the law to the facts so as not to declare a breach or award damages lightly. The lack of proof of ABB's knowledge of the cross-subsidization before May 2005, however, does not negate the finding that ABB knowingly drove revenue from the Plans to the party who provided it corporate services.

**B.     The IPS was one of the "documents and instruments governing the plan" under 29 U.S.C. §1104(a)(1)(D); ABB thus was obligated to follow it.** *ABB Issue 1.*

ABB erroneously contends it is not liable for violating the Plans' Investment Policy Statement (IPS) because the IPS is not a "document" or "instrument" "governing the plan." ABB suggests there can be only one "plan document", which the IPS is not. ABB Br. 19. The text of 29 U.S.C. §1104(a)(1)(D), which

Appellate Case: 12-2060     Page: 36     Date Filed: 05/15/2013 Entry ID: 4035705

establishes ABB's duty to comply with the IPS, plainly states otherwise by referring to the plural "documents" and "instruments" that govern the plan. Section 1102(a)(1) sets a minimum standard for ERISA generally: requiring at least one document that identifies at least one plan fiduciary, provides a procedure for establishing and carrying out a funding policy and method, provides a procedure for allocating responsibilities for operation and administration of the plan, specifies the basis on which payments are made to and from the plan, and identifies the procedure by which that document can be amended and by whom. 29 U.S.C. §1102(a)–(b). The §1102(a)(1) document may also provide that individuals can serve in more than one fiduciary capacity, that a fiduciary may hire others to provide fiduciary advice, and that a fiduciary may hire investment managers. *Id.* §1102(c). But nothing in that statute suggests there can be only one document or instrument that governs the plan or the plan fiduciaries and §1104(a)(1)(D) specifically states there can be numerous such "documents and instruments". *See also*, *e.g.*, *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 304 (2009). Even ABB's own cite recognizes that more than a single document can be part of the plan documents, holding that summary plan descriptions "are considered part of the ERISA plan documents." *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 949 (8th Cir. 1994).

ABB attempts to argue the contrary by relying on benefits cases brought under

Appellate Case: 12-2060     Page: 37     Date Filed: 05/15/2013 Entry ID: 4035705

29 U.S.C. §1132(a)(1)(B). ABB. Br. 19. The type of plan document in a benefits claim is limited to that which defines the benefit to which a participant is entitled. A participant may bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §1132(a)(1)(B). A fiduciary breach action under §1132(a)(2) has nothing to do with the calculation of benefits. It is an action to enforce ERISA's fiduciary duties, which are the highest known to the law. 29 U.S.C. §1132(a)(2), §1109(a), §1104(a); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009)(quoting *Donovan v. Bierwith*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982)). Defining the plan document by which an administrator—who may not be a fiduciary—determines what benefits are due a participant is different from determining what documents govern a fiduciary's actions. A document that fiduciaries specifically adopt to govern the discharge of their fiduciary duties in the selection, retention, and removal of plan investment options may have nothing to do with determining whether a participant is entitled to benefits, but everything to do with whether the fiduciaries properly discharged their duties regarding plan investment options. Indeed, a document that a fiduciary adopts to govern its own actions is evidence, if not an admission, of what the fiduciary considers to be prudent conduct. *See* 29 U.S.C. §1104(a)(1)(B).

An IPS specifically serves that purpose—limiting the fiduciary's discharge of

Appellate Case: 12-2060     Page: 38     Date Filed: 05/15/2013 Entry ID: 4035705

his duties in selecting, retaining, and removing plan investment options. Thus, DOL has recognized that an IPS is a document or instrument governing the plan under §1104(a)(1)(D). 29 C.F.R. §2509.08-2(2) (2008) (Interpretive Bulletin 08-2). This Bulletin is entitled to substantial deference because it was made "in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case." *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944), *cited in Christensen v. Harris County*, 529 U.S. 576, 587 (2009). Courts also have found an IPS to be a governing plan document under §1104(a)(1)(D). "Fiduciaries who are responsible for plan investments governed by ERISA must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042 (9th Cir. 2001). "[F]ailure to follow written statements of investment policy constitutes a breach of fiduciary duty." *Id.* (*citing Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241–42 (2d Cir. 1989)). A violation of investment guidelines is an independent breach of fiduciary duty, regardless of whether the action was otherwise prudent. *Dardaganis*, 889 F.2d at 1241–42; *see also Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 318–19 (5th Cir. 1999)("fund investment guidelines" are plan documents under §1104(a)(1)(D)).

Appellate Case: 12-2060     Page: 39     Date Filed: 05/15/2013 Entry ID: 4035705

Indeed, this also was the conclusion of ABB's own outside counsel, who stated, "*Case law, and the DOL's formal stated position, indicates that the Policy is a plan document with which the Committee must comply*." SA245 (emphasis added); *see* Tr. 867:21 – 869:13. ABB's counsel added "*the Committee must follow the Policy, if it is adopted, and that a failure to follow the Policy would be a breach of fiduciary duty*[.]" SA246 (emphasis added).

The IPS itself states that it is "intended to summarize the underlying philosophy and process for the selection, monitoring and evaluation and, if necessary, removal of investment options offered" under the Plans and contains the "criteria for the monitoring, evaluation and de-selection of the investment results of the Plans' investment options." ASA495. It states the "Criteria for Monitoring, Evaluating and De-Selecting Investment Options" in compulsory "will" terms, instead of suggestive terms such as "should" or "will attempt." ASA498. Among those compulsory terms was the obligation, to the extent possible, "to use the purchasing power afforded by the size of plan assets to reduce the cost to participants of providing the Plans' investment options." ASA497. If an investment option provided different share classes, ABB obligated itself to "select that share class that provides plan participants with the lowest cost of participation." *Id.* In the event the selected and retained investment options made payments to the Plans' recordkeeper (revenue sharing), ABB obligated itself to use those payments "to

Appellate Case: 12-2060     Page: 40     Date Filed: 05/15/2013 Entry ID: 4035705

offset or reduce the cost of providing administrative services to plan participants."ASA499.

The PRC accepted Cutler's recommendation that it adopt the Policy to govern the performance of their fiduciary responsibilities over plan investments. The PRC clearly treated the Policy as a formal governing document, even to the extent of having a formal amendment process. Tr. 991:6–24. The PRC specifically amended the IPS to "explicitly allow investment advice" to participants and "to add additional investment options", for example. Tr. 994:6–15. Cutler even sought the advice of counsel in drafting the document. Tr. 969:3–17. Cutler specifically acknowledged "unless the policy is inconsistent with ERISA, the committee must follow the policy." Tr. 869:7–13. He saw the IPS as defining his "roles and responsibilities ... with regards to these plans." Tr. 996:5–7. ABB's V.P. of Human Resources, John Sackie, also acknowledged that ERISA requires an IPS and that it must be followed. Tr. 152:4–153:4. These facts demonstrate that the fiduciaries themselves—the PRC and Cutler—recognized and accepted that the IPS *was* a document that governed the plan, and more specifically that governed their discharge of their duties to the Plans.[4] *See also* Tr. 1313:7–25 (IPS is "very important" and is a "document that governs how the plan should be run." ).

---

[4] In fact, ABB's trial counsel argued that the Freedom Funds were "mandated under the specific provisions of the IPS's three-tier structure", implicitly acknowledging the IPS *was* a plan document. Tr. 72:12–18.

Appellate Case: 12-2060     Page: 41     Date Filed: 05/15/2013 Entry ID: 4035705

The district court thus correctly concluded that the IPS is a "document[] or instrument[] governing the plan" under §1104(a)(1)(D).

### C. ABB breached the IPS and ERISA's fiduciary standards by causing the Plans to pay excessive recordkeeping fees. *ABB Issues 9, 10*

Even if the IPS were not a plan document, it nonetheless is compelling evidence of what these fiduciaries considered to be prudent and loyal discharge of their duties. 29 U.S.C. §1104(a)(1)(A)–(B). Through the IPS, ABB acknowledged what ERISA's fiduciary standards meant as applied to the PRISM Plans.

The district court properly found ABB violated these standards. FDA317–28. Its findings are not clearly erroneous. Fed.R.Civ.P. 52(a)(6); *Taylor*, 403 F.3d at 965; *Story*, 659 F.3d at 685. Most Plan investment options provided revenue sharing to Fidelity. FDA317; SA242; SA188. Because these revenue sharing payments came out of the investments' annual expense ratios, plan participants effectively paid Fidelity's recordkeeping fees. FDA318. The IPS required ABB to use the Plans' size to obtain low investment costs, use the lowest-cost share class of selected investments, or at least to use revenue sharing from plan investments "to offset or reduce the cost of providing administrative services to plan participants." ASA497, ASA499. Similarly, ERISA required plan fiduciaries to ensure a plan pays no more than "reasonable expenses of administering the plan." 29 U.S.C. §1104(a)(1)(A)(ii).

To perform these duties, of course, ABB first had to monitor how much

Appellate Case: 12-2060     Page: 42     Date Filed: 05/15/2013 Entry ID: 4035705

revenue sharing Plan investments paid to Fidelity. If ABB did not know the amount Fidelity received, it could not have determined whether that amount was reasonable. ABB *never* calculated the amount of revenue sharing Fidelity received; *never* determined a benchmark reasonable recordkeeping fee that Fidelity should receive; and failed to use the Plans' billion-dollar-plus size to keep recordkeeping costs at a level appropriate for a plan of this size. FDA319. Even more egregiously, ABB failed to do this *even after its chosen consultant warned that it was paying unreasonable fees and appeared to be having the Plans subsidize the corporate services Fidelity provided to ABB*. *Id.*; ASA903–06. Even ABB's own expert— Laura Starks—did not know what Fidelity's actual recordkeeping compensation was, much less whether Fidelity's revenue sharing money was reasonable or excessive compensation. Tr. 2560:2–16. ABB does not dispute these facts, much less prove that they were clearly erroneous. Fed.R.Civ.P. 52(a)(6); *Taylor*, 403 F.3d at 965; *Story*, 659 F.3d at 685.

It was not enough, as ABB argues, to just use revenue sharing to pay for recordkeeping—and thereby "offset ... the cost of providing administrative services to plan participants" (ASA499)—if the "offset" fees were far in excess of what was reasonable for the services provided. Using revenue sharing to "offset" excessive fees does not comply with the IPS or with a fiduciary's duty to pay only reasonable fees. 29 U.S.C. §1104(a)(1). Instead, prudent and loyal fiduciaries recover excess

Appellate Case: 12-2060     Page: 43     Date Filed: 05/15/2013 Entry ID: 4035705

revenue sharing and return it to the plan for the participants' benefit, just as the IPS Alliance Rebate program required. This is exactly what the Texa$aver plan did, overseen by Defendants' expert Laura Starks. Tr. 2547:4 – 2551:6; SA633, SA634.

ABB's claim that it requested any rebate of excessive revenue sharing payments is not supported by the record it cites and was rejected by the court's findings. ABB Br. 49. ABB's claim that Fidelity "generally" does not provide rebates from its mutual funds is false. Fidelity *did* provide revenue sharing rebates from its mutual funds to the Texa$aver plan. Tr. 2547:4 – 2551:6; SA633, SA634; SA349. Moreover, recovering rebates of excessive revenue sharing payments Fidelity received does not depend on whether Fidelity mutual funds or other mutual funds paid that revenue sharing. *Cf.* ABB Br. 49. Fidelity received *all* of that revenue sharing and the fiduciaries could have had Fidelity credit to the Plans the excessive amount without seeking refunds from specific mutual funds.

ABB also points to what it claims was a "rigorous fund selection process", of considering each mutual fund's total expense ratio, which is "all that matters[.]" ABB Br. 50 (*citing Hecker v. Deere & Co.*, 556 F.3d 575, *supplemented*, 569 F.3d 708 (7th Cir. 2009)). *Hecker* is inapplicable for several reasons. First, the portion of *Hecker* that ABB quotes (Br. 51) concerns the question of whether revenue sharing must be *disclosed* to plan participants. The sufficiency of fee disclosures to Plan participants is not at issue here. Second, *Hecker* conflicts with the law in this

Appellate Case: 12-2060    Page: 44    Date Filed: 05/15/2013 Entry ID: 4035705

Circuit on that point. *Braden*, 588 F.3d at 599–600 (revenue sharing must be disclosed because it is material). Third, even the Seventh Circuit recognizes that excessive recordkeeping fees can be a fiduciary breach regardless of participant disclosure. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–800 (7th Cir. 2011). For a fiduciary merely to look at mutual funds' total expense ratio and completely disregard how much revenue sharing those funds provide to the plan's recordkeeper (and whether they are providing excessive compensation that should be rebated to the plan) is an outright breach of loyalty and prudence, as the district court correctly found.

### D. ABB is entitled to no deference for its fiduciary acts or its interpretation of the IPS. *ABB Issue 2.*

ABB erroneously contends that its fiduciary decisions are entitled to deference. ABB Br. 23–24, 26. Instead, fiduciary acts are reviewed *de novo* for compliance with ERISA's exacting standards. *In re Unisys Savings Plan Litig*., 173 F.3d 145, 154–55 (3d Cir. 1999)(*citing Struble v. N.J. Brewery Employees' Welfare Trust Fund*, 732 F.2d 325 (3d Cir. 1984)); *John Blair Communs., Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 369 (2d Cir. 1994). "Any other rule would allow plan administrators to grant themselves broad discretion over all matters concerning plan administration, thereby eviscerating ERISA's statutory command that fiduciary decisions be held to a strict standard." *John Blair*, 26 F.3d at 369.

Appellate Case: 12-2060     Page: 45     Date Filed: 05/15/2013 Entry ID: 4035705

ABB attempts to import the deferential standard of review given to discretionary *benefits* claim determinations in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112 (1989). ABB Br. 23–24. *Firestone* is limited to §1132(a)(1)(B) cases. 489 U.S. at 108; *Conkright v. Frommert*, 559 U.S. 506, 130 S.Ct. 1640, 1649 (2010); *Hackett v. Standard Ins. Co.*, 559 F.3d 825, 829–30 (8th Cir. 2009). Moreover, even for benefits cases, *Firestone* rejects ABB's argument that a fiduciary *per se* is entitled to deference. *Firestone*, 489 U.S. at 113–14. Instead, deference is given only when "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan"—again, in the context of a benefits determination—*and* only when the terms are "disputed or doubtful". *Id.* at 111, 115; *Conkright*, 130 S.Ct. at 1649. That limited deference is not proper for fiduciary breach claims. *Unisys*, 173 F.3d at 154–55; *John Blair*, 26 F.3d at 369; *Donovan v. Mazzola*, 716 F.2d 1226, 1231 (9th Cir. 1983)(deferential "business judgment rule" does not apply to selection of plan investments). Unlike benefits determinations, ERISA "imposes high standards of fiduciary duty upon those responsible for administering an ERISA plan and investing and disposing of its assets", which is a "strict standard of care." *Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992); *Braden*, 588 F.3d at 598.

The fiduciary breach cases on which ABB relies are distinct because they

Appellate Case: 12-2060     Page: 46     Date Filed: 05/15/2013 Entry ID: 4035705

concern valuation of non-publicly-traded employer stock in Employee Stock Ownership Plans (ESOPs). ABB Br. 23 (*citing Armstrong v. LaSalle Bank N.A.*, 446 F.3d 728, 733 (7th Cir. 2006), and *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009)). ESOPs involve unique issues that are not relevant to general fiduciary duties. See *Unisys*, 173 F.3d at 155.

*Armstrong* recognizes that "the *general* standard of review of an ESOP's decisions is plenary" and applies its deferential standard only when the fiduciary has "a balancing act to perform" where different participants will benefit from either choice. 446 F.3d at 733. An ESOP fiduciary's "decision that involves a balancing of competing interests under conditions of uncertainty requires an exercise of discretion, and the standard of judicial review of discretionary judgments is abuse of discretion." *Id.* In those circumstances, the fiduciary must choose between actions that benefit one group of participants but harm another group. ABB identifies no equally competing prudent decisions it had to choose between, no balancing-act among competing participants, in allowing Fidelity to receive excessive fees. All participants were harmed by ABB's breach and none benefitted. Therefore, *Armstrong* would not apply even were this an ESOP case.

*Bunch* does not even adopt *Armstrong*'s abuse-of-discretion standard or hold that the ESOP fiduciary's decision was entitled to any deference. 555 F.3d at 7. It addresses only the question of whether the fiduciary's actions are to be judged by

Appellate Case: 12-2060     Page: 47     Date Filed: 05/15/2013 Entry ID: 4035705

the efficient market standard. *Id.*

The Ninth Circuit recently imported *Firestone* deference into a fiduciary breach case, but its decision is erroneous. *Tibble v. Edison Int'l*, 711 F.3d 1061, 2013 U.S. App. LEXIS 5598, *31–37 (9th Cir. Mar. 21, 2013), reh'g pet'n pending (Apr. 4, 2013). *Tibble* altogether ignored the Third Circuit's decisions in *Unisys* and *Struble* and completely misinterpreted *Moench v. Robertson*, 62 F.3d 553, 565 (3d Cir. 1995). *Tibble*, LEXIS *33. *Moench* confirms that *Firestone* deference "should not be applied mechanically to all ERISA claims, and that claims analogous to those addressed by *Struble* merit de novo review." 62 F.3d at 565. As *Moench* notes,

> *Struble* involved a decision by an ERISA fiduciary to give a benefit to the employer rather than to the beneficiary—the fiduciary was required to decide which of two classes to favor....When the fiduciary's alignment with the employer class was added to the mix, its stark, conflicted position became evident.

*Id.* at 563. Thus, per *Moench*, fiduciaries in a conflict of interest are owed *no deference*.

Here, ABB was in precisely the conflict of interest that precludes any deference. ABB caused the Plans to pay excessive recordkeeping fees because of its conflicted interest in getting subsidized corporate services from Fidelity and rendering recordkeeping expenses "opaque" so that the Plans appeared to cost participants nothing. FDA321, FDA336–38, FDA348, FDA361. Cutler in fact *tried*

Appellate Case: 12-2060     Page: 48     Date Filed: 05/15/2013 Entry ID: 4035705

to enforce the IPS by seeking to negotiate directly with mutual funds to obtain rebates of revenue sharing *for the Plans*. ASA504; SA256. Mr. Sackie, however, shut that down so as to preserve the opaqueness of hidden recordkeeping fees and build the Fidelity relationship that resulted in free and low-cost corporate services from Fidelity. SA256; SA232; Tr. 603:23 – 604:13. Cutler's initial attempt to obtain revenue sharing rebates *for the Plans*, instead of Fidelity, affirms the district court's conclusion that that is precisely what the IPS required.[5]

ABB claims that the district court merely "gave ... no weight" to its claims that revenue sharing provided "progressivity" and "risk-sharing" and thus complied with the IPS. ABB Br. 24. That misrepresents the court's judgment. The court found no problem with a plan choosing revenue sharing "as it model for compensating its recordkeeper" and recognized that "progressivity" in theory has participants with bigger accounts pay more of the cost of administering the plan. FDA321.[6] There was simply no evidence that ABB engaged in any process to evaluate "whether their revenue sharing model actually implemented

---

[5] ABB also claims the EBC was entitled to deference in its interpretation of the Plans, but does not identify any EBC interpretation to which the court putatively should defer. ABB Br. 23–24. ABB points to the trial testimony of Mr. Cutler. *Id.* at 24–25. Yet, ABB does not even claim the Plans granted Mr. Cutler any discretion to interpret its terms, the predicate for the *Firestone* deferential standard ABB seeks to import into this case.

[6] Thus, the reasons why revenue sharing instead of per capita fees may be prudent in the abstract are irrelevant to this appeal. *Cf.* ABB Br. 25 (*citing Loomis v. Exelon Corp.*, 658 F.3d 667, 672–73 (7th Cir. 2011)).

Appellate Case: 12-2060     Page: 49     Date Filed: 05/15/2013 Entry ID: 4035705

'progressivity,' so that individuals with greater assets in the Plan paid more for Plan recordkeeping services." FDA322. There was no evidence of any connection between the size of participant investments and the revenue sharing provided by those investments, to prove that richer participants actually paid more in administrative expenses through revenue sharing. *Id.* On the contrary, wealthy participants could obtain a high return "even when investing in only passively managed options, which pay little to no revenue sharing." *Id.* At best, the evidence showed that participants who invested in actively managed funds paid more in revenue sharing, but there was no justification for imposing more of the administrative expense burden on those investors. *Id.* ABB does not even attempt to dispute these facts, much less demonstrate how they are clearly erroneous. Fed.R.Civ.P. 52(a)(6); *Taylor*, 403 F.3d at 965; *Story*, 659 F.3d at 685. In fact, without knowing the amount of revenue sharing fees that was being paid, ABB could not have evaluated the "cost" it was paying for progressivity.

The court also recognized the theoretical justification for "risk sharing"—reducing plan administrative expenses when investment values drop—but noted that recordkeepers could just ask for more fees when their costs relative to fees rise, just as Fidelity did in this case. FDA325–26. Fidelity retained the option to reset its fee every year on 75-days' notice and later got a revenue neutrality agreement. ASA367, ASA442. Thus, it could not lose; it shared no risk from

Appellate Case: 12-2060    Page: 50    Date Filed: 05/15/2013 Entry ID: 4035705

declining plan investments, since it could keep its revenues neutral in any case. FDA326. Since ABB never determined how much Fidelity received in revenue sharing compensation, it was "never in a position to ask for a rebate when Fidelity revenue sharing exceeded the value of the recordkeeping services provided." *Id.* The court found no evidence that ABB engaged in any cost-benefit analysis of this supposed "risk sharing" program. FDA321. Again, ABB does not even attempt to dispute these facts, much less demonstrate how they are clearly erroneous. Fed.R.Civ.P. 52(a)(6); *Taylor*, 403 F.3d at 965; *Story*, 659 F.3d at 685.

It is not micro-management or second guessing, as ABB complains, for the court to find that these failures by ABB to engage in any prudent process to ensure that revenue sharing from Plan investments did not pay Fidelity unreasonable fees, in breach of the IPS and ERISA's duties of loyalty and prudence. It is the simple application of recognized fiduciary principles that a loyal, prudent fiduciary would have followed, but ABB did not because of its conflicted interest in "taking care" of Fidelity.

### E. *Hecker*, *Loomis*, and *Renfro* have no bearing on this case. *ABB Issue 8.*

This case does not "crash[] headlong into *Hecker*, *Loomis*, and *Renfro*[.]" ABB Br. 44–46. They are on a wholly different track. Those three cases address only the pleading required to state a claim for breach of ERISA's fiduciary duties, an issue that is not remotely related to this bench-tried case. None of them concerned

Appellate Case: 12-2060     Page: 51     Date Filed: 05/15/2013 Entry ID: 4035705

excessive recordkeeping fees from the fiduciaries' abject failure to monitor those fees, and blatant conflict of interest in allowing those fees to subsidize other corporate services. *Hecker* holds only that "a bare allegation that cheaper investments exist in the marketplace" is not enough to state an ERISA fiduciary breach claim. *Braden*, 588 F.3d at 596 n.7. This case goes far beyond merely alleging that cheaper investments "exist in the marketplace." *Hecker* addressed whether the fiduciaries breached their duty by failing to inform participants of revenue sharing and by limiting plan investment options to Fidelity mutual funds. *Hecker*, 556 F.3d at 584–85. Again, those are not issues in this case. Moreover, this Court in *Braden* recognizes that, despite *Hecker*, fund selections that are motivated by a conflict of interest (as is the case here) violate ERISA. 588 F.3d at 600–01.

*Loomis* concerned allegations that it was a breach to "offer[] 'retail' mutual funds" and require participants to pay plan expenses. 658 F.3d at 670–71. *Renfro v. Unisys Corp.* also concerned an allegation that it was a breach to use "retail mutual funds[.]" 671 F.3d 314, 319, 325–26 (3d Cir. 2011). The mere use of retail mutual funds is not an issue in this case, and Plaintiffs here do not contend they should not have to pay recordkeeping expenses. They contend instead that they should not have to pay *unreasonable* recordkeeping expenses through uncapped revenue-shared fees deducted from their mutual fund investments. Since they were decided

at the pleading stage, those cases did not have the voluminous record of fiduciary breaches that exists in this case.

Contrary to ABB's suggestion that the Seventh Circuit has rejected any recordkeeping fee claim so long as a plan has a "broad range" of investments, the Seventh Circuit has recognized that evidence of excessive recordkeeping fees and fiduciaries' failure to put the plan's recordkeeping services out for competitive bidding for over 15 years states a triable claim of fiduciary breach. *George*, 641 F.3d at 798–800 (reversing summary judgment). ABB also had not put the Plans' recordkeeping services out for competitive bidding for over 15 years (Tr. 313:22 – 314:11, 3074:16–24), and Plaintiffs presented convincing evidence that the Plans' recordkeeping expenses were excessive (*see* Argument I.F., *infra* at 40). Thus, even the Seventh Circuit would affirm the district court's judgment (including ordering ABB to put the Plans' recordkeeping services out for competitive bidding).

This Court has expressly recognized that allegations that plan fiduciaries failed to utilize a plan's size to bargain for lower-cost investments and allowed revenue sharing to pay excessive recordkeeping fees state a claim for breach of ERISA's fiduciary duties. *Braden*, 588 F.3d at 590, 598. That is what Plaintiffs *proved* in this case.

Appellate Case: 12-2060    Page: 53    Date Filed: 05/15/2013 Entry ID: 4035705

**F.      The Plans lost $13.4 million.** *ABB Issue 11.*

The district court properly found credible and reliable the damages calculations and testimony of Plaintiffs' expert Albert J. Otto. FDA322–25, FDA375–76. He concluded that the Plans suffered over $13.4 million in losses from excessive recordkeeping fees. *Id.*; ASA883; Tr. 1326:10 – 1335:16. "The district court's credibility determination is virtually unreviewable on appeal." *Little Rock Sch. Dist. v. Arkansas*, 664 F.3d 738, 754 (8th Cir. 2011). The district court is given "wide latitude" in determining expert testimony is reliable. *Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir. 2010).

Ample evidence supported Otto's credibility and reliability. Otto is a member of American Society of Pension Professionals & Actuaries, and is an Accredited Investment Security Analyst. Tr. 1298:9–17. He has served as investment advisor and independent fiduciary to hundreds of plan sponsors. Tr. 1292:22 – 1294:24, 1298:21 – 1299:2. He worked with plans that ranged in size from a few million dollars with 50 participants to over $500 million with 12,000 – 14,000 participants. Tr. 1300:12–18. He has published numerous articles on plan fees. Tr. 1296:14 – 1298:4.

In addition to Otto's ample qualifications as an expert in this area, other undisputed evidence supported Otto's opinion that a reasonable per-participant recordkeeping fee for the Plans was $58–$70 (varying by year). Tr.1331:8–21;

Appellate Case: 12-2060      Page: 54      Date Filed: 05/15/2013 Entry ID: 4035705

ASA883.[7] Fidelity's *own documents* showed that a competitive recordkeeping fee for similar size plans was $58–$70. SA192; Tr. 1338:9 – 1344:19, 442:12 – 443:3; SA466, Tr. 3339:17–20; SA552; Tr. 1356:6 – 1357:16, 3431:5 – 3433:13, 3366:25 – 3368:19.[8] The down-sloping trendline of Fidelity's chart of market-negotiated recordkeeping fees (SA552) shows that per participant recordkeeping fees decrease as the number of participants increase and matches nearly exactly Otto's trendline "limit of reasonableness" for recordkeeping fees (SA629–30, SA631). Tr. 1356:6 – 1357:16.

Mercer Consulting advised ABB in 2005 that a reasonable recordkeeping fee was $70 per participant. ASA903. Fidelity admitted this fee information was based on plans that received recordkeeping services similar to what the PRISM Plans received. Tr. 3375:10–15, 3373:22 – 3374:14.

The Texa$aver Program for Texas government employees was a comparably sized defined contribution retirement program that included mutual funds and recordkeeping services. SA622, SA626–27; Tr. 2600:21–23; SA350. Texa$aver Program participants paid only $52–$58 for recordkeeping fees. Tr. 2576:6 – 2577:25. That was even less than Otto's range of $58–$70. ASA883. The

---

[7] The $44 fee in Otto's exhibit is for the partial year (nine months) of 2007. Tr. 1363:14–18.

[8] Fidelity admitted the comparison data points on this chart were accurate (although it disputed the accuracy of the ABB data points). Tr. 3438:4–9, 3373:7–12.

Appellate Case: 12-2060      Page: 55      Date Filed: 05/15/2013 Entry ID: 4035705

Texa$aver fiduciaries obtained rebates for the plan of all mutual fund revenue sharing, which directly reduced the amount a participant paid in fees. Tr. 2547:4 – 2551:6; SA633, SA634. ABB's own expert witness—Laura Starks—served as a fiduciary to that program, making it a particularly telling example of a prudently administered retirement plan. Tr. 2514:14–19. Even though those fiduciaries were exempt from ERISA (29 U.S.C. §1003(b)(1)), they rebated revenue sharing to the plan to reduce participant recordkeeping fees. That is an apt indication of what prudent fiduciaries in such circumstances should have done in an ERISA-governed plan. 29 U.S.C. §1104(a)(1)(B).

Further support for Otto's opinion appears in *George*, 641 F.3d at 788, 798–99. That recordkeeping expert determined that Kraft's multibillion dollar plan should have paid only $20–$27 in recordkeeping fees. *Id.* The Seventh Circuit held such testimony and the fact that Kraft had failed to put plan recordkeeping services out for competitive bidding for 15 years sufficiently stated a fiduciary breach claim to reverse a summary judgment entered for the defendants. *Id.* at 798, 800.

The district court's finding credible and reliable Otto's opinion on the limit of a reasonable recordkeeping fee for the PRISM Plans thus was strongly supported by the evidence and was not clearly erroneous. Fed.R.Civ.P. 52(a)(6); *Taylor*, 403 F.3d at 965; *Story*, 659 F.3d at 685.

ABB complains that the district court failed to issue a *Daubert* opinion

Appellate Case: 12-2060     Page: 56     Date Filed: 05/15/2013 Entry ID: 4035705

addressing ABB's 2009 motion to strike Otto's expert reports and testimony. ABB Br. 52–58; *see* C-ASA1–166. That complaint is meritless because *Daubert* opinions are unnecessary in a bench-tried case. *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012); *Cox v. Zurn Pex, Inc.*, 644 F.3d 604, 613 (8th Cir. 2011). Moreover, as indicated above, the court clearly determined that Otto's expert testimony was reliable and thus satisfied *Daubert*, a determination amply supported by the record.

Otto properly based his opinion in part on his own experience. *Cf.* ABB Br. 52. "An expert's testimony is not unreliable simply because it is founded on his experience rather than on data[.]" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). The expert need only "employ[] in the courtroom that same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). ABB does not identify any way in which Otto failed to employ in his trial testimony the "same level of intellectual rigor" that characterizes the practices of a recordkeeping consultant. ABB's focus on claimed gaps in Otto's qualifications or knowledge only address the weight, not the admissibility of his testimony. *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006); *Metavante*, 619 F.3d at 762.

Doubts regarding the usefulness of an expert's testimony must be resolved in

Appellate Case: 12-2060    Page: 57    Date Filed: 05/15/2013 Entry ID: 4035705

favor of admissibility. *Marmo*, 457 F.3d at 758. Expert testimony need only "advance[] the trier of fact's understanding to any degree." *Robinson*, 447 F.3d at 1100 (quoting 29 Wright & Gold, FED. PRACTICE & PROC. EVID. §6265 (1997)). The "rejection of expert testimony is the exception rather than the rule." *Id.* "Determination on admissibility should not supplant the adversarial process[.]" *Metavante*, 619 F.3d at 762. "A district court necessarily has 'considerable discretion' in deciding whether to admit expert testimony where the factual basis is disputed." *Cox*, 644 F.3d at 615 (quoting *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 916 (8th Cir. 2005)). ABB addressed all of its criticisms of Otto to the district court and the court found them unpersuasive. The court did not clearly err in doing so.

ABB's criticisms of the evidence that supported Otto are baseless. ABB Br. 56–58. The Texa$aver Program's exemption from ERISA regulation does not render the recordkeeping arrangements in that Program inapt. The fact that those fiduciaries were not subject to ERISA's stringent duties only makes this evidence more compelling. If even those not subject to ERISA's stringent duties recovered revenue sharing for a retirement plan and reduced recordkeeping fees below $70 per participant, then certainly ABB, who *was* subject to ERISA's stringent duties, should have acted similarly. Moreover, *ABB* produced the fiduciary *from the Texa$aver Program* (Starks) as its expert witness on recordkeeping fees. ABB thus

Appellate Case: 12-2060     Page: 58     Date Filed: 05/15/2013 Entry ID: 4035705

conceded that administration of the Texa$aver plan was relevant to how ABB should have managed the PRISM Plans.

Contrary to ABB's suggestion, Starks did not show that Texa$aver paid more recordkeeping fees per participant than ABB's Plans. She presented only "one case" in which participants who invested in a particular fund (Munder Mid-Cap Growth) in a "hypothetical" scenario *might* pay more in recordkeeping fees. Tr. 2414:16 – 2416:9 (explaining how it does not "necessarily mean" that rebated revenue sharing results in "lower overall record keeping costs", Tr. 2414:16–20). Contrary to another ABB misrepresentation, the district court did not agree with this analysis; the court just explained to ABB's attorney that his tedious repetition of Starks's opinion that Texa$aver is more expensive was unnecessary: "Let's move on. I understood it." Tr. 2416:16; *cf.* ABB Br. 57 (*citing* Tr. 2416–17). Such a hypothetical is irrelevant to the fact that ABB failed altogether to adduce any evidence that *it* ever engaged in any analysis of how its revenue sharing program with Fidelity compared to a per-participant charge with rebated revenue sharing. Indeed, ABB did not even know how much Fidelity received from revenue sharing.

Starks and ABB persistently analyzed Plan fees at trial only on an aggregated basis—melding (or "bundling") recordkeeping fees in with investment management and other fees into an artificial "total plan fee." Tr. 2415:17 – 2415:4.

45

That is invalid because it conceals an unreasonable expense of administering the plan. 29 U.S.C. §1104(a)(1)(A)(ii). Even Fidelity's expert admitted, "Understanding total plan expenses [is] not sufficient; fiduciary must understand fees paid to all plan service providers and evaluate the services provided." SA587. ABB presented *no evidence* that it ever conducted an analysis of any benefit to participants of "bundled" versus "unbundled" fees to demonstrate which was reasonable, much less determined that one versus the other was solely and exclusively in the interest of participants. 29 U.S.C. §1104(a)(1). In fact, such a determination or comparison was impossible, since ABB never knew, nor took any steps to discover, how much revenue sharing Fidelity received.

ABB's only criticism of its own Mercer report is to point to its expert's (Starks) speculation that some of the plans in the Mercer reports had "company stock" for which there is "no cost", and that if the comparison plan had "a lot of company stock" it could seem cheaper than a plan without company stock. Tr. 2705:4–13; ABB Br. 58. She provided no actual data on any of the plans included in the Mercer report, much less evidence that any of them had so much "no cost" company stock as to skew their plan recordkeeping fees. This was not evidence, much less evidence sufficient to render reliance on Otto's damages calculation an abuse of discretion. ABB also points to Starks's speculation that the Mercer plans were so "much larger" that they could have achieved "economies of scale" not

Appellate Case: 12-2060    Page: 60    Date Filed: 05/15/2013 Entry ID: 4035705

available to the PRISM Plans. Tr. 2705:14–21; ABB Br. 58. Again, she provided

no details or evidence to support that speculation. Such abstract and speculative

criticisms of the Mercer reports were not enough to render them irrelevant, or

change the fact that ABB's own consultant told ABB that these Plans'

recordkeeping fees were excessive. FDA324–25.

The district court's calculation of Plan losses was reasonable, *Feilen*, 965 F.2d

at 672, was amply supported by the evidence in this case, and was not an abuse of

discretion. *Gonzalez v. United States*, 681 F.3d 949, 950, 952 (8th Cir. 2012).

Nothing in that award "is 'plain injustice' or a 'monstrous' or 'shocking result.'"

*Id.* at 952 (quoting *Overton v. United States*, 619 F.2d 1299, 1304 (8th Cir. 1980)).

**II.  ABB breached its fiduciary duties by unilaterally transferring participant investments in the Wellington Fund into Fidelity's Freedom Funds, causing Plan losses of $21.8 million.**

**A.  ABB violated the IPS and ERISA's fiduciary duties by transferring Wellington Fund investments to Fidelity's Freedom Funds. *ABB Issues 1, 5.***

The district court correctly found that ABB's replacement of the Wellington

Fund with Fidelity's Freedom Funds violated the IPS and §1104(a)(1)(D).

FDA333–53. ABB claims Wellington was properly removed because of poor

performance, but the facts belie that claim. The IPS provided specific criteria and

processes for removing and adding investment options. Investment options were to

be "selected from publicly available mutual funds or their institutional

Appellate Case: 12-2060     Page: 61     Date Filed: 05/15/2013 Entry ID: 4035705

equivalents[.]" ASA497. Fund performance was supposed to be evaluated over rolling three and five year periods. ASA498. If a fund performed "significantly below its relevant benchmark", the PTM was to notify the PRC in writing and initiate a formal review with ABB's Benefits Department. *Id.* The results of that review with a recommendation were to be presented to the PRC. *Id.*

ABB ignored these requirements in removing Wellington to drive revenue to Fidelity. Cutler provided no information to the PRC regarding the three- to five-year performance history of the Wellington Fund. Tr. 1161:20-23. Indeed, he did not even know what the return for the Wellington Fund was between 1996 and 2000. Tr. 1160:9-22. No calculations were performed regarding the performance of the Wellington Fund that would have led to its removal consistent with the IPS. Tr. 1161:20-1162:11. Cutler did not even recommend that the Wellington Fund go on a watch list, as required by the IPS. Tr. 1161:24 – 1162:2; *cf.* Tr. 1127:23 – 1128:15 (six month watch list for funds that underperform in one-, three-, and five-year periods).

In contrast to Cutler's claimed "deteriorating performance" of the Wellington Fund (ASA485), Wellington in fact was a consistently *stellar* performer over its 70-year history. Tr. 1815:20 – 1816:14. In the five years preceding its removal from the Plans, it outperformed in four years, and the only year it underperformed was an exception because it did not get caught up in the tech stock bubble that

Appellate Case: 12-2060      Page: 62      Date Filed: 05/15/2013 Entry ID: 4035705

inflated (and subsequently popped) so many other funds. Tr. 1815:20 – 1816:4; ASA526, ASA539. Even with that one year of underperformance out of five, Wellington gained 13.1% versus its benchmark of 9.2%, a "very good to excellent" performance for a mutual fund. Tr. 1816:5–14; SA632; Tr. 1818:24 – 1819:7. Any claim that Wellington was a bad fund thus is baseless. The district court correctly found that ABB violated the IPS standard for removing funds when Wellington had a performance history that satisfied IPS standards for retention. FDA344–46.

The court also correctly found that ABB failed to follow the IPS process for carefully reviewing an adequate number of options by considering only two options to replace Wellington and selecting Fidelity's Freedom Funds despite their unproven track record in contrast to Wellington's stellar history. FDA344–46; ASA573, ASA526; Tr. 1815:20 – 1816:14. In addition to violating the IPS, ABB's failure also was disloyal and imprudent. 29 U.S.C. §1104(a)(1)(A)–(B). These facts show that ABB replaced Wellington not for any legitimate reason, but because Wellington paid no revenue sharing and the Freedom Funds did.

To counter these findings, ABB first argues that the IPS was not a "plan document" and thus its violation of the IPS did not violate §1104(a)(1)(D). ABB also argues that its interpretation should be given deference. Those arguments are invalid for the reasons stated *supra* at 22 and 31. ABB also argues that it is not liable for moving participants from Wellington into Fidelity's Freedom Funds

Appellate Case: 12-2060     Page: 63     Date Filed: 05/15/2013 Entry ID: 4035705

because that was supposedly "hard-wired" into the Plan by Appendix VI to the Plan, which ABB contends was added in March 2004. ABB Br. 22 (*citing* ASA271); SA77–78; Tr. 2200:3–2201:17. ABB cites no authority explaining what "hard-wired" means or how that affects an ERISA fiduciary's discharge of its duties. Just because that Plan document allegedly required inclusion of Fidelity's Freedom Funds as a plan investment in 2004, Plan fiduciaries were not *compelled* to use Fidelity's Freedom Funds if they were imprudent or had no track record. Section 1104(a)(1)(D) expressly provides that a fiduciary must comply with a plan document only insofar as the document is consistent with ERISA's fiduciary duties. In other words, ERISA's fiduciary duties trump even the express direction of the Plan's creator, particularly where the fiduciaries have laid out those duties in an IPS that predates the plan amendment. Moreover, Appendix VI just provides for inclusion of Fidelity's Freedom Funds as a plan investment; it does not compel the use of those Funds as the Tier 1 investment, much less the *exclusive* Tier 1 investment, or the forced transfer of Wellington investments into those funds. Those decisions were made by the plan fiduciaries.

ABB's contention that divestment from Wellington and investment in Fidelity's Freedom Funds was compelled by Appendix VI also is undermined by its contention that the decision to replace Wellington with Fidelity's Freedom Funds happened before December 2000 (well before the supposed "hard wiring" of

Appellate Case: 12-2060     Page: 64     Date Filed: 05/15/2013 Entry ID: 4035705

those Funds in 2004). ABB Br. 32. If the fiduciaries were free to add and remove investments from the Plans regardless of when the Plan was amended, then the Plan could not have controlled fiduciary decisions over plan investments. Instead, that argument concedes that Appendix VI merely documented what the fiduciaries had already decided, and thus that the Plan did not "hard-wire" Fidelity's Freedom Funds into the Plans or otherwise compel the fiduciaries to use or retain those Funds in lieu of Wellington.

In fact, the removal of the Wellington Fund and the transfer of Wellington investments to Fidelity's Freedom Funds happened well before, and irrespective of, any amendment or attachment of an appendix to the Plans. ABB instructed Fidelity Trust to "liquidate all participant balances held in the Vanguard Wellington Fund" and to invest those "proceeds in the appropriate Freedom Fund" on March 30, 2001. FDA478. This occurred at a time when the Plan had supposedly "hard-wired" the Wellington Fund and did not even mention Fidelity's Freedom Funds. See SA304 (1999 Plan). This demonstrates that the listing of investments in the Plan did not "hard-wire" anything and did not limit in any way the fiduciaries' selection, retention, or removal of Plan investment options. Instead, the decisions to add, retain, or remove funds were fiduciary decisions governed by the IPS and ERISA's statutory fiduciary duties, not the Plan document. The district court properly found ABB violated those duties.

Appellate Case: 12-2060      Page: 65      Date Filed: 05/15/2013 Entry ID: 4035705

**B.    Replacing Wellington with Fidelity's Freedom Funds was not required to meet the Plans' Tier 1 investment requirements.** *ABB Issue 5.*

ABB suggests that even though Wellington might have been an adequately performing fund, it was properly replaced with Fidelity's Freedom Funds as part of ABB's goal of providing a prudent Tier 1 investment. ABB Br. 36–37. For this, ABB and its amicus point out that target date funds like the Freedom Funds are specifically approved by DOL as qualified default investment options for participants who do not select their own investments. ABB Br. 42; see 29 C.F.R. §2550.404c-5. But the DOL does not say that target date funds are the *only* suitable default options. It also approves of balanced funds, 29 C.F.R. §2550.404c-5(e)(4)(ii), and Wellington was a balanced fund, ASA555–56. Yet, ABB did not even engage in *any process* to determine that Fidelity's untested Freedom Funds would be a prudent selection for Tier 1 instead of the stellar-performing Wellington Fund. And, contrary to ABB's suggestion, the IPS did not compel selection of Fidelity's Freedom Funds or even target date funds as the Tier 1 investment. *Cf.* ABB Br. 9. The IPS required for the Tier 1 funds only that

> the Plans will offer several 'managed allocation' funds designed to offer the participant a professionally managed, well diversified fund or funds appropriate for the participants' investment goals.

ASA496. Again, Wellington was professionally managed and well diversified, and thus qualified for Tier 1 under the IPS, but ABB did not even consider it.

Appellate Case: 12-2060    Page: 66    Date Filed: 05/15/2013 Entry ID: 4035705

ABB did not even give participants the choice to continue investing in the well-performing Wellington Fund or the choice of selecting between Wellington and the Freedom Funds. Instead, ABB removed Wellington altogether and moved all participants investments in Wellington to Fidelity. That was because Wellington did not provide the revenue sharing that the Freedom Funds did, which led to opaque recordkeeping fees and free and low-cost corporate services for ABB.

Cutler offered at trial a "glide-path" "explanation" for selecting Fidelity's Freedom Funds and completely disregarding Wellington, but the court found that not credible. FDA340. That is "virtually unreviewable on appeal", *Little Rock*, 664 F.3d at 754, and was not clearly erroneous.

## C. Eliminating Wellington investments and putting them into Fidelity's Freedom Funds was a prohibited transaction. *ABB Issue 6.*

The district court properly found mapping Wellington investments into Fidelity's Freedom Funds to be prohibited by 29 U.S.C. §1106(a)(1)(D). FDA376–77. Section 1106(a)(1)(D) must be "read broadly in light of Congress'[s] concern with the welfare of plan beneficiaries." *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984)(distinguishing *Bierwirth*, 680 F.2d at 270); *see also Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987). What constitutes a plan asset also must be broadly construed to comport with the protective provisions of ERISA. *Grindstaff v. Green*, 133 F.3d 416, 432 (6th Cir. 1998); *Acosta v. Pac. Enterprises*, 950 F.2d 611, 620 (9th Cir. 1991). "The entire statutory scheme of ERISA

Appellate Case: 12-2060     Page: 67     Date Filed: 05/15/2013 Entry ID: 4035705

demonstrates Congress'[s] overriding concern with the protection of plan beneficiaries, and we would be reluctant to construe narrowly any protective provisions of the Act." *Leigh*, 727 F.2d at 126.

ABB's cases are inapposite. *Citizens Bank* held that DOL failed to prove what specific provision of §1106 was violated by the fiduciary's loan of plan assets to third parties, but recognized that interjection of a third party into an otherwise prohibited transaction will not sanitize an illegal dealing. *Brock v. Citizens Bank of Clovis*, 841 F.2d 344, 346–47 (10th Cir. 1988). Section "1106(a)(1) by its own terms applies to sham dealings by proscribing 'indirect' transactions." *Id.* at 347. That is what happened here. By moving Wellington investments, which had no revenue sharing, into Fidelity's Freedom Funds, ABB foisted upon participants a burden of paying plan expenses they had not chosen. That transaction is no less prohibited by the interjection of Fidelity than if ABB had just taken the recordkeeping fee directly from participant accounts. *Evans* holds only that §1106 does not prohibit one from being a fiduciary for two competing plans, an issue not present here. *Evans v. Bexley*, 750 F.2d 1498, 1500 & n.3 (11th Cir. 1985). *Amato* does not include an analysis to support its holding and thus is of no persuasive value. *Amato v. W. Union Int'l, Inc.*, 773 F.2d 1402, 1417 (2d Cir. 1985).

Section 1106(a)(1)(D) clearly applies.

> A fiduciary with respect to a plan shall not cause the plan to engage in
> a transaction, if he knows or should know that such transaction

Appellate Case: 12-2060    Page: 68    Date Filed: 05/15/2013 Entry ID: 4035705

> constitutes a direct or indirect ... transfer to, or use by or for the
> benefit of a party in interest, of any assets of the plan[.]

29 U.S.C. §1106(a)(1)(D). ABB caused the Plans to place participant investments into Fidelity's Freedom Funds. Participant investments in mutual funds are plan assets even though the assets of the underlying mutual fund are not. 29 U.S.C. §1101(b)(1); 29 U.S.C. §1002(21)(B). ABB's manipulation of plan assets to divert them to revenue sharing Freedom Funds for ABB's own benefit was a "use of plan assets" that was "harmful to the plan." *Lockheed Martin Corp. v. Spink*, 517 U.S. 882, 893 (1996). Contrary to ABB's assertion, *Spink* does not compel reversal here. It holds only that a "payment of benefits conditioned on performance by plan participants [signing a release] cannot reasonably be said to share that characteristic." *Id.* Section 1106(a)(1)(D) "simply does not address what an employer can and cannot ask an employee to do in return for benefits." *Id.* at 894. That is not what ABB did here.

ABB also contends there was no transfer of plan assets to or for the use of ABB, but it ignores the fact that §1106(a)(1)(D) applies to "direct or indirect" transfers from which it benefits. Transferring participant investments to Fidelity's Freedom Funds provided just such an indirect benefit to Fidelity *and* ABB: it enhanced Fidelity's excessive compensation, which led to ABB's free and low-cost corporate services. The district court's finding that this was prohibited by §1106(a)(1)(D) was not clearly erroneous.

Appellate Case: 12-2060     Page: 69     Date Filed: 05/15/2013 Entry ID: 4035705

**D.    This claim is not barred by ERISA's six-year statute of limitations.** *ABB Issue 4.*

Both ABB and Fidelity rely on ERISA's statute of limitations to protect them from liability for their breaches. ABB Br. 31–33, 38–39; Fidelity Br. 40–42. ERISA requires commencement of an action within six years of a breach of fiduciary duties. 29 U.S.C. §1113. However, unlike other limitations statutes, ERISA's limitation does start until "the date of the last action which constituted a part of the breach or violation, or in the case of an omission the latest date on which the fiduciary could have cured the breach or violation[.]" 29 U.S.C. §1113(1)(A)–(B).

ABB erroneously contends that a decision by the PRC in 2000 to replace Wellington with Fidelity's Freedom Funds is the "last action which constituted a part of the breach or violation[.]" That is not even the breach in question. The actions constituting part of the breach are removing Wellington from the Plans, putting Fidelity's Freedom Funds in the Plans, and mapping Wellington investments into Fidelity. That mapping did not even start until March 2001, when ABB instructed Fidelity to "liquidate all participant balances held in the Vanguard Wellington Fund" and to invest those "proceeds in the appropriate Freedom Fund". FDA478; FDA351–52.

ABB inaccurately claims the PRC ordered these actions to be taken in its November 2000 meeting. ABB Br. 32 (*citing* ASA485, ASA508). First, the PRC

Appellate Case: 12-2060     Page: 70     Date Filed: 05/15/2013 Entry ID: 4035705

never voted to remove Wellington or to map Wellington investments into Fidelity's Freedom Funds. ASA486, ASA508–10. Second, although the PRC voted to add Fidelity's Freedom Funds to the Plans (ASA508), that was not an actionable breach because the Plan suffered no loss at that point. *Braden*, 588 F.3d at 595 ("loss to the Plan" is element of fiduciary breach claim). ABB's interpretation of §1113 would result in the absurd result that a decision to commit a breach made in one year but not executed until over six years later would protect those actionable breaches from liability under ERISA. Moreover, it would bar even the claims of participants who did not join the Plans (and thus suffered losses) until recently. Because §1113 does not bar the fiduciary breach claim over the mapping of Wellington to Fidelity's Freedom Funds, it equally does not bar the prohibited transaction claim over the same transactions.

ABB's cases do not support its argument. One of ABB's cases is not even an ERISA case. *Delaware State College v. Ricks*, 449 U.S. 250 (1980). Other cases concern ERISA's three-year limitation period (29 U.S.C. §1113(2)), which starts upon the *earliest* date upon which a plaintiff gains "actual knowledge" of a breach. *Librizzi v. Children's Mem. Med. Ctr.*, 134 F.3d 1302, 1305 (7th Cir. 1998); *Radford v. Gen. Dynamics Corp.*, 151 F.3d 396, 399 (5th Cir. 1998); *Browning v. Tiger's Eye Benefits Consulting*, 313 Fed.Appx. 656, 661–63 (4th Cir. 2009); *Blanton v. Anzalone*, 760 F.2d 989, 991 (9th Cir. 1985). The timing of the three-

Appellate Case: 12-2060     Page: 71     Date Filed: 05/15/2013 Entry ID: 4035705

year limitation is the opposite of the six-year limitation; it starts upon the *first* of a series of known breaches. There is no claim here any plaintiff had actual knowledge of defendants' breaches more than three years before filing suit. Fidelity also erroneously relies on cases that apply the three-year statute, including *Radford* and *Phillips v. Alaska Hotel & Rest. Employees Pension Fund*, 944 F.2d 509 (9th Cir. 1991).

Both ABB and Fidelity rely on *Larson v. Northrop Corp.*, but that case concerned a single act—the purchase of an annuity to pay benefits upon termination of a plan—that was the claimed breach. 21 F.3d 1164, 1165, 1167 (D.C. Cir. 1994). The plan was terminated on that date, so there could be no subsequent fiduciary acts. *Id.* at 1169. Because that sole act (necessarily the last action constituting a part of the breach) occurred more than six years before the plaintiff filed suit, his claim was barred. *Id.* at 1169. Here, Plaintiffs do not even contend the 2000 meetings constituted a fiduciary breach, and defendants undeniably committed further fiduciary acts after that date within the six-year period that constitute the actual breaches at issue in this case—namely, the transfer of plan assets from Wellington to Fidelity, from which the Plans' losses resulted. FDA351–53.

ABB claims these were ministerial acts, not fiduciary acts, but disregards the fact that exercising "*any* authority or control respecting management or disposition

Appellate Case: 12-2060     Page: 72     Date Filed: 05/15/2013 Entry ID: 4035705

of [plan] assets" is a fiduciary act. 29 U.S.C. §1002(21)(A)(i) (emphasis added);

*FirsTier Bank N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994). ABB does not

dispute the district court's conclusions that each of the defendants were fiduciaries

or that the ABB defendants were exercising authority and control respecting

management or disposition of plan assets by ordering the mapping from

Wellington to Fidelity in 2001. FDA352. Moreover, a fiduciary cannot hide behind

a "ministerial act" shield, claiming he was just following orders. Even a directed

trustee with no discretion—who receives special exemption from liability under 29

U.S.C. §1103(a)—has the discretion and the duty to refuse orders that violate

ERISA.

> [A]n ERISA trustee who deals with plan assets in accordance with
> proper directions of another fiduciary is not relieved of its fiduciary
> duties to conform to the prudent man standard of care, see 29 U.S.C.
> §1104(a); to attempt to remedy known breaches of duty by other
> fiduciaries, see 29 U.S.C. §1105(a); and to avoid prohibited trans-
> actions, see 29 U.S.C. §1106.

*FirsTier*, 16 F.3d at 911.

ABB and Fidelity both rely on *David v. Alphin*, but that case concerns unique

facts that are distinct from this case. 704 F.3d 327 (4th Cir. 2013). The *David*

plaintiffs challenged the initial selection of the employer's proprietary mutual

funds as plan investment options. *Id.* at 342. The mutual funds were first included

in the plan more than six years before the plaintiffs commenced their action. *Id.*;

817 F.Supp.2d 764, 768 (W.D.N.C. 2011). The plaintiffs originally conceded their

{01459183.DOCX; 1}

claims were barred by the six-year limitation absent fraud or concealment. 817

F.Supp.2d at 768 n.4, 777. Given the way that case was pleaded, *David* expressly

did not address a fiduciary's "ongoing duty to remove imprudent investment

options in the absence of a material change in circumstances[.]" 704 F.3d at 341.

*David* thus did not address the fact that ERISA imposes a *continuing* duty of

loyalty and prudence upon plan fiduciaries. *Martin v. Consultants & Admin'rs,*

*Inc.*, 966 F.2d 1078, 1087–88 (7th Cir. 1992)(ERISA fiduciary duties regarding

plan investments is of a "continuing nature ... to review plan investments and

eliminate imprudent ones"). Merely because fiduciaries repeatedly breach their

duties for more than six years does not mean they avoid liability for the breaches

that occur within six years. "[G]iven ERISA's imposition of a continuing fiduciary

duty, past knowledge of a past violation generally should not be held to preclude a

suit for a repeated or continued violation." *Id.* at 1089.

> If knowledge of an ERISA violation barred claims based on similar
> *future* conduct, this continuing fiduciary duty would be severely
> weakened, and trustees would be left free to engage in repeated
> violations, so long as they have once been discovered but not sued.

*Id.* at 1088 (*citing Buccino v. Continental Assurance Co.*, 578 F.Supp. 1518, 1521

(S.D.N.Y. 1983)). Numerous district courts recognize the continuing nature of

ERISA's fiduciary duties and apply the six-year limitation to bar claims only as to

breaches that occurred more than six years earlier, but not as to the breaches within

six years, for reasons that compel rejection of Defendants' contrary arguments.

Appellate Case: 12-2060    Page: 74    Date Filed: 05/15/2013 Entry ID: 4035705

*See*, *e.g.*, *Mahoney v. J.J. Weiser & Co.*, 564 F.Supp.2d 248, 259 (S.D.N.Y. 2008);

*Boeckman v. A.G. Edwards Inc.*, 461 F.Supp.2d 801, 814 (S.D.Ill. 2006) ("In light

of the continuing duty of prudence imposed on plan fiduciaries by ERISA, each

failure to exercise prudence constitutes a new breach of duty, that is to say, a new

claim."); *Whitfield v. Cohen*, 682 F.Supp. 188, 196 (S.D.N.Y. 1988) (noting duty

to monitor investment performance "with reasonable diligence and to withdraw the

investment if it became clear or should have become clear that the investment was

no longer proper for the  Plan."); *Buccino*, 578 F.Supp. at 1521 ("Fund fiduciaries

… were under a continuing obligation to advise the Fund to divest itself of

unlawful or imprudent investments. Their failure to do so gave rise to a new cause

of action each time the Fund was injured by its continued possession of individual

policies, that is, each time it made a premium payment."). So did the district court.

FDA315. Holding otherwise

> would recognize no obligation on the part of a plan fiduciary to
> dispose of unsound investments once he had been neglectful for six
> years, because only the initial failure to act, not subsequent failures,
> would give rise to a cause of action, and that action would be time
> barred.

*Buccino*, 578 F.Supp. at 1521. *David* did not address this issue and it would

conflict with the settled law of other circuits to construe it as if it had, or to accept

ABB's and Fidelity's interpretation of §1113.

The Ninth Circuit recently followed *David* and held that a claim over

Appellate Case: 12-2060     Page: 75     Date Filed: 05/15/2013 Entry ID: 4035705

imprudent mutual funds was barred because the mutual funds were first included in the plan over six years before commencement of that action. *Tibble*, LEXIS *6–9. That decision is incorrect for the reasons stated above. *Tibble* wholly ignores an ERISA fiduciary's ongoing duty to remove imprudent funds. The DOL filed amicus briefs in both *David* and *Tibble* strenuously objecting to this misinterpretation of §1113. *See* Br. of Acting Sec'y of Labor as *Amicus Curiae*, *David v. Alphin*, 704 F.3d 327 (4th Cir. Feb. 28, 2013); Br. of Sec'y of Labor as *Amicus Curiae*, *David v. Alphin*, 704 F.3d 327 (4th Cir. Dec. 28, 2011); Br. of Sec'y of Labor as *Amicus Curiae*, *Tibble v. Edison*, 711 F.3d 1061 (9th Cir. May 25, 2011).

Plaintiffs contend the breach in this case was removing Wellington from the Plans and transferring all Wellington investments to Fidelity's Freedom Funds. Unquestionably, those acts occurred in 2001, within six years before Plaintiffs commenced their action. This claim is not barred.

### E. The Plans lost $21.8 million. *ABB Issue 7.*

The court found that the proper measure of the Plans' losses from moving participants' Wellington investments to Fidelity was to compare how the amounts invested in the Freedom Funds would have performed had they been invested in Wellington. That was reasonable because Wellington was a consistently high-performing fund, which participants had chosen before ABB removed it. FDA376–

Appellate Case: 12-2060     Page: 76     Date Filed: 05/15/2013 Entry ID: 4035705

77.

Calculation of plan losses need not be precise. "[I]t will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Feilen*, 965 F.2d at 672 (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)); *Cal. Ironworkers*, 259 F.3d at 1047. Plaintiffs had only to make a prima facie case of loss to the Plans. *Feilen*, 965 F.2d at 671. It then was ABB's burden to prove a different loss, or that the Plans' losses were not caused by its breach. *Id.*; *Bierwirth*, 754 F.2d at 1056. This ABB failed to do, as the court pointed out, FDA376–77. ABB does not dispute this on appeal.

ABB speculates that some participants may not have stayed in Wellington during the entire damages period or that participants who invested in Fidelity's Freedom Funds might not have invested in Wellington during the entire damages period. ABB Br. 41–44. While that is possible, it is theoretical and speculative. The more reasonable presumption is that participants would have continued to invest as they had before. *Leister v. Dovetail, Inc.*, 546 F.3d 875, 881 (7th Cir. 2008). ABB presented no evidence to support its theory. Had ABB a different basis for calculating plan losses, it was obligated to present it and not just speculate hypotheticals on appeal.

ABB provides no basis for concluding that the district court's calculation of

Appellate Case: 12-2060    Page: 77    Date Filed: 05/15/2013 Entry ID: 4035705

plan losses was clearly erroneous. *Gonzalez*, 681 F.3d at 950, 952–53. ABB

provides no basis for concluding that the court's calculation of Plan losses is

"monstrous", "shocking", or "plain injustice[.]" *Id.* at 952.

### III.  ABB breached its fiduciary duties by putting higher-cost share classes of mutual funds in the Plans to benefit itself.

The district court found that ABB breached its fiduciary duties in six particular

instances where a mutual fund offered ABB the choice of two share classes, and

ABB chose to put in the Plans the share class that charged higher fees because of

the revenue sharing that provided to Fidelity. FDA355–56; SA573–75; Tr. 1354:4

– 1355:1.[9] The court found that violated IPS §5, which states,

> When a selected mutual fund offers ABB a choice of share classes,
> ABB will select that share class that provides Plan participants with
> the lowest cost of participation.

FDA355–56; ASA497. The court concluded §5 obligated ABB to select the

lowest-cost share class offered by the mutual fund. FDA355. That also is what any

prudent fiduciary, acting "solely in the interest of the participants" and defraying

only "reasonable expenses of administering the plan" would have done. 29 U.S.C.

§1104(a)(1). The court found this breach to be "but another example of ...

protecting the recordkeeping fees of Fidelity at the expense of Plan participants."

FDA378. The court did not separately award damages from these breaches,

because it found these damages to be subsumed by the $13.4 million recordkeeping

---

[9] The two share classes were identical in all respects except fees.

Appellate Case: 12-2060    Page: 78    Date Filed: 05/15/2013 Entry ID: 4035705

fee award. FDA378. ABB does not challenge this conclusion.

ABB contends that the court misconstrued IPS §5 to mean "lowest cost" was the "*only* proper criterion for offering a fund" and that ABB thus had to "scour the market to find and offer the cheapest possible fund (which might of course be plagued by other problems)[.]" ABB Br. 24 (quoting *Hecker*, 556 F.3d at 586). That is not what the court held. Choosing the lower cost of two available share classes of the exact same mutual fund does not require any "scour[ing]" of the market to find the "cheapest possible *fund*"; it requires only the barest of diligence of a fiduciary acting "solely in the interest of the participants", 29 U.S.C. §1104(a)(1). Once ABB decided the PIMCO Total Return Fund (for example) was a prudent investment option, it required virtually no more effort to select the cheaper share class of that Fund, which is identical in all other respects. SA573 (¶a). ABB does not dispute that it *could* have selected the cheaper share class of each of these mutual funds. That cheaper share class would not be "plagued" by any other problem because it was the *exact same investment*, just with lower annual fees. The higher cost share class offered no benefit to participants, but it enhanced Fidelity's revenue sharing stream, which funded the free and low-cost corporate services Fidelity provided to ABB.

ABB contends that selecting higher-cost mutual fund share classes benefitted participants because the revenue sharing in those higher-cost share classes

Appellate Case: 12-2060    Page: 79    Date Filed: 05/15/2013 Entry ID: 4035705

provided "progressivity"—placing a greater share of recordkeeping expenses on richer participants—and "risk-sharing"—causing Fidelity to suffer lower fees when Plan investments lost value. ABB Br. 24–25. ABB contends those alleged "benefits" lowered all administrative expenses for all participants and in that way satisfied IPS §5 by providing all participants the "lowest cost of participation" *in the Plans*. Yet, the revenue neutrality agreement prevented participants from benefitting if investments lost value and the lack of a cap allowed Fidelity to receive unlimited revenue sharing. The court properly rejected ABB's "progressivity" and "risk-sharing" theories for the reasons indicated *supra* at 35–37. FDA321–22, FDA325–26. The court correctly concluded that "lowest cost of participation" in IPS §5 refers to participation in the *mutual fund*, which IPS §5 specifically refers to, and not the "lowest cost of participation" in the *Plans*, to which §5 does not refer. FDA356. Moreover, ABB did not even know how much Fidelity was receiving in revenue sharing. Tr. 161:20–24, 354:11 – 355:3, 860:18 – 861:6,  873:12 – 877:9. ABB thus could not have determined that selecting higher-cost share classes of mutual funds resulted in *lower* total plan administrative expenses for all participants.

ABB claims that selecting higher cost mutual fund shares was necessary to maintain the "revenue neutrality" arrangement with Fidelity. Since the recordkeeping arrangement provided Fidelity unreasonable fees, the court properly

Appellate Case: 12-2060     Page: 80     Date Filed: 05/15/2013 Entry ID: 4035705

pointed out that maintaining that imprudent arrangement through "revenue neutrality" also was imprudent. FDA356–57. ABB never calculated how much in revenue sharing Fidelity received and thus could never have determined that Fidelity's revenue sharing compensation was reasonable. The evidence showed this compensation was completely unreasonable. Moreover, that "revenue neutrality" arrangement was thoroughly tainted by ABB's conflicted desire to boost Fidelity's income, thereby enabling the corporate services Fidelity provided to ABB. Selecting higher-cost share classes of mutual funds in order to maintain that arrangement was clearly not the act of a loyal, prudent fiduciary, nor did that comply with IPS §5.

## IV. Fidelity breached its fiduciary duties by retaining float income from plan assets, causing Plan losses of $1.7 million.

### A. Fidelity's arguments that float is not a plan asset have no merit. *Fidelity Issue 1.*

Fidelity argues that under "ordinary notions of property rights" and notions of "risks of ownership" (and other notions), the money from which it earned float income was not a plan asset. Fidelity Br. 5, 21, 33. Fidelity did not make those arguments before the district court. *See* Doc. 103;[10] Doc. 283; Doc. 354; Doc. 495; Doc. 552; Tr. 3826:1 – 3827:16. They are waived. *Quinn v. St. Louis County*, 653 F.3d 745, 752 n.6 (8th Cir. 2011).

---

[10] ECF Document number. All page references are to the ECF page number.

Appellate Case: 12-2060    Page: 81    Date Filed: 05/15/2013 Entry ID: 4035705

They also fail. DOL has extensively defined what funds constitute plan assets, including detailed regulations, bulletins, letters, and advisory opinions. See 29 C.F.R. §§2510.3-101 and 2510.3-102. Plan contributions are plan assets immediately once they are "segregated from the employer's general assets." 29 C.F.R. §2510.3-102(a)(1). Distributions remain plan assets until the funds are drawn from the plan's trust account by the check recipient. Advisory Opinion 93-24A (Sep. 13, 1993);[11] DOL Information Letter (Aug. 11, 1994) (Info. Ltr.).[12] DOL addressed a plan trustee who issued benefits checks to participants and simultaneously moved the funds from the plan's account to the trustee's account, earning interest on those funds until they ultimately were delivered to the participant's account. Adv. Op. 93-24A. DOL held that the funds—float—were plan assets; thus, interest earned on the funds is a plan asset, which the trustee could not keep for itself without committing a prohibited transaction. *Id.*; *see also George*, 641 F.3d at 800 (*citing*, *inter alia*, Thomas P. Fitch, Dictionary of Banking Terms 198 (5th ed. 2006), and David L. Scott, Wall Street Words 152 (3d ed. 2003)); *Commonwealth Edison Co. v. Vega*, 174 F.3d 870, 873 (7th Cir. 1999)("until the check to the beneficiaries is actually presented to the plan for payment through the banking system, and paid, the money due to the beneficiary is an asset of the plan"). DOL reiterated this position and clarified that a bank cannot

---

[11] http://www.dol.gov/ebsa/programs/ori/advisory93/93-24a.htm.
[12] http://www.dol.gov/ebsa/regs/ILs/il081194.html.

Appellate Case: 12-2060     Page: 82     Date Filed: 05/15/2013 Entry ID: 4035705

avoid the prohibited transaction merely by transferring the float money to a different account. Info. Ltr., third paragraph ("a bank fiduciary's unilateral decision to handle plan assets in such a way as to benefit itself constitutes prohibited self-dealing."). Not only is the trustee liable for earning interest for itself from plan float, the trustee is liable for failing to earn interest on the float for the benefit of the plan. *Id.*, fourth paragraph (§1108(b)(6) "does not provide relief for a bank trustee who maintains cash balances in a zero-interest disbursing account within the same institution to the extent that it is reasonably possible to earn net returns for the plan on those monies.").

DOL's interpretation is clear: funds become plan assets the instant a contribution is "segregated from the employer's general assets" and remain plan assets until the instant they are delivered to the ultimate recipient's account (whether that be the participant or a mutual fund). DOL's clear delineation of "plan assets" is entitled to deference because it is "thorough, valid, and particularly consistent" and persuasive. *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 647 (8th Cir. 2007). What constitutes a plan asset must be broadly construed to comport with the protective provisions of ERISA. *Grindstaff*, 133 F.3d at 432; *Acosta*, 950 F.2d at 620.

Because the definition of plan assets in this case is settled, there is no need to resort to "ordinary notions of property rights", as Fidelity seeks (*citing Kalda).*

Appellate Case: 12-2060     Page: 83     Date Filed: 05/15/2013 Entry ID: 4035705

Fidelity's reliance on *Kalda* also is improper because that case did not concern payroll deductions that had actually been segregated from the employer's general assets; instead, it concerned only a spreadsheet of contributions that would be paid *if* the employer chose to recommence funding a plan. *Id.* at 645, 647. Those are markedly different circumstances from this appeal, where Fidelity is attempting to claim that contributions actually segregated from ABB's general account were not plan assets or ceased to be plan assets at some point before the recipient actually received her distribution.

Fidelity attempts to distinguish between "depository" and "redemption" float, but there is no significant difference. The only difference is the payee of the check (a mutual fund for investment or a participant for distributions) and that difference in payee does not alter the fact that Fidelity retains the funds covering the check as trustee for the Plans from the point that the check is written until the funds are drawn by the bank into which the check is deposited, which in each instance is float and thus a plan asset, as DOL's Advisory Opinion and Information Letter make clear.

Fidelity confuses the issue by focusing on the participant-distributee instead of the Plans. No doubt the recipient of a check is not entitled to the funds represented by the check until the check has been presented to the Plans' trust account through the banking process; the recipient is not entitled to the float or interest on the float.

Appellate Case: 12-2060     Page: 84     Date Filed: 05/15/2013 Entry ID: 4035705

(For the same reason, Fidelity's mutual fund affiliates are not entitled to the float interest earned on participant investments in those funds, contrary to what Fidelity is doing.) The question, however, is whether the float is a *Plan* asset, not whether it is a *participant* asset. Undoubtedly, the funder of the check owns the funds in the checking account until the check is presented, and thus is entitled to any interest earned on that float. In this case, the owner is the *Plans*, not Fidelity, who is only trustee for the Plans. Float is a plan asset, not Fidelity's asset.

Float income can be used for the trustee's benefit *only* through an "openly negotiated" agreement with an independent plan fiduciary to retain float earnings as part of the trustee's compensation. Info. Ltr., fifth paragraph. That "openly negotiated" agreement must be preceded by a "full and fair disclosure" of the trustee's float practices. *Id.*; *see also* DOL Field Assistance Bulletin 2002-03 (Nov. 5, 2002);[13] *George*, 641 F.3d at 800–01.

There was no such agreement here. Fidelity's float practices were not even disclosed. The court found ABB did not know of Fidelity's float practices. FDA373. Fidelity's trust agreement says nothing whatsoever about float. Instead, it clearly limited the sources of Fidelity's compensation to a detailed, specific, two-page list of fees, none of which refers to interest on float. FDA446–47. The trust agreement further specifies, "no part of the Trust may be used for, or diverted to,

---

[13] http://www.dol.gov/ebsa/regs/fab2002-3.html.

Appellate Case: 12-2060      Page: 85      Date Filed: 05/15/2013 Entry ID: 4035705

purposes other than the exclusive benefit of the participants in the Plan or their beneficiaries prior to the satisfaction of all liabilities with respect to the participants and their beneficiaries." FDA424 (§2). Fidelity cobbles together bits and pieces out of the trust agreement to try to justify its use of float income to pay its own expenses, Fidelity Br. 38–40, but none of that remotely satisfies ERISA's requirement of a fully disclosed, openly negotiated agreement to allow an ERISA plan trustee to use float for its own benefit.

Fidelity's reliance on *Associates in Adolescent Psychiatry, S.C. v. Home Life Insurance Co.*, 941 F.2d 561 (7th Cir. 1991), is misplaced. Fidelity Br. 6, 27–28. That trustee (HTNB) earned float income under a contract that expressly allowed that as a form of the trustee's compensation. *Associates*, 941 F.2d at 569. In addition, HTNB was *not* the ERISA plan's trustee. *Id.* at 568. Instead it was trustee for an insurance company (Home Life) that sold annuity contracts to defined benefit plans and handled the *insurance company's* funds, not plan assets. It was the insurance company's—not the plan's—float, and the insurance company contracted it away as part of its trustee's compensation.

*Faber v. Metropolitan Life Insurance Co.*, 648 F.3d 98 (2d Cir. 2011), is similarly inapposite. *Cf.* Fidelity Br. 6, 28, 36 n.17. It concerned defined benefit plans in which participants were paid a specific death benefit deposited into an interest-bearing account from which the participant could draw any amount at any

Appellate Case: 12-2060    Page: 86    Date Filed: 05/15/2013 Entry ID: 4035705

time. *Faber*, 648 F.3d at 100–01. Once the death benefit was paid into the account, it was no longer a plan asset—a position with which DOL agreed. *Id.* at 102. Thus, the fact that the insurance company earned income on those accounts did not implicate ERISA in any way. *Id.* at 106. Here, Fidelity argues plan assets ceased being plan assets *before* they were deposited either into the mutual fund's or the participant's account. *Faber* provides no support for that argument. Fidelity's arguments that this float was not a Plan assets fails.

## B. This claim is not barred by ERISA's six-year statute of limitations. *Fidelity Issue 2.*

Fidelity contends this claim is time-barred because it has been earning float interest on plan assets for more than six years. It cites absolutely no evidence, and it presented no evidence at trial, that its "float-income practices" were "instituted much more than six years before the complaint was filed." Fid. Br. 42. It did not even assert this claim was time-barred in its proposed findings and conclusions. Doc. 552 at 34–36. Thus, there is no factual basis for Fidelity's limitations argument.

Fidelity's argument also is invalid because it disregards the continuing nature of ERISA's fiduciary duties, *see supra* at 60–61, specifically the prohibition against using plan assets for Fidelity's profit. Under that argument, Fidelity would be free to continue violating its fiduciary duties, no matter how egregious they may be, forever, because ERISA's statute of limitations somehow grants it perpetual

Appellate Case: 12-2060    Page: 87    Date Filed: 05/15/2013 Entry ID: 4035705

immunity. ERISA does not do that. The six-year limitation period does not start until "the date of the *last action* which constituted a part of the breach". 29 U.S.C. §1113(1). The last action constituting a part of Fidelity's breach in unlawfully retaining float income was the last date on which it received such income. So long as that occurred within six year before commencement of an action over that breach, as is the case here, then the Plans can recover all losses from the breach within the preceding six years. *See* FDA655.

Fidelity claims that this is the so-called "continuing violation theory" and that courts have rejected importing that theory to toll the six-year limitation period. For the reasons explained in Argument II.D., that is incorrect. Fidelity's cases do not alter that conclusion. *Adamson v. Armco, Inc.*, does not even concern §1113 because the plaintiffs had no standing to assert their claims. 44 F.3d 650, 653–55 (8th Cir. 1995)(applying Minn. Stat. §541.07(5) to §1132(a)(1)(B) benefits claim). Although *Adamson* makes passing reference to "continuing breach" in regard to the *Minnesota* limitations statute, 44 F.3d at 653–54, it contains no analysis that has any persuasive value for this case or ERISA. The district court in *Angell v. John Hancock Life Ins. Co.*, erroneously (and without analysis) applied *Phillips* and *Adamson* to ERISA's six-year limitation period as an alternative to its conclusion that the claim was barred by the three-year limitation. 421 F.Supp.2d 1168, 1175–76 (E.D.Mo. 2006), *aff'd*, 223 Fed.Appx. 527 (8th Cir. 2007)(per

Appellate Case: 12-2060    Page: 88    Date Filed: 05/15/2013 Entry ID: 4035705

curiam). This Court affirmed only the application of the three-year limitation. 223 Fed.Appx. at 528; 8th Cir. R. 47B.

### C.     The Plans lost $1.7 million. *Fidelity Issue 3.*

The district court properly found that Plaintiffs proved a prima facie loss to the Plans "associated with failing to distribute float income solely for the interest of the Plan[s]." FDA379. The court found Otto's testimony and calculation of these losses to be credible. FDA380. For float on contributions, Otto estimated Fidelity's float revenue by assuming a one-day delay from the deduction of plan contributions to the allocation of those contributions to participant accounts. Tr. 1349:5–11; FDA655. That accorded with the testimony of Fidelity's witness, Brigitte Gentile. Tr. 1179:22 – 1180:21 (FDA257–58), 1181:4–23. For float on distributions, Otto assumed a 22-day delay, based on Gentile's testimony that distributions from participant accounts generally took 15–29 days to transfer to individual participant bank accounts. Tr. 1349:12–18 (FDA293), 1232:2–10 (FDA288); FDA655.

Interest earned on both items of float was based on the interest rate of Fidelity's retirement money market fund. Tr. 1349:5–18 (FDA293). That had to be estimated, because Fidelity did not disclose (even at trial) how much interest it actually earned on Plan assets. *See* Tr. 1182:13–23. Both rates, however, reflect short-term interest, and Fidelity does not appeal the use of its money market rate as

Appellate Case: 12-2060    Page: 89    Date Filed: 05/15/2013 Entry ID: 4035705

the interest factor.

That total amount was compounded to present value at the rate of the S&P 500 index to account for the fact that most plan assets were invested in stocks. Tr. 1349:19–21 (FDA293); FDA655; Tr. 1349:22–23, 1350:20 – 1351:20 (FDA293–95). In some years that return was positive, in some it was negative. FDA655. The S&P 500 index was proper for this purpose because, had the float been applied to plan administrative expenses (as it should have been), that amount would not have been deducted from participant investments, which consequently would have grown at approximately the rate of the S&P 500 index, since they were invested mostly in equities. That resulted in total float damages of $1,745,635, which the district court rounded down to $1.7 million. FDA380, FDA655.

The district court's calculation of Plan losses was based on evidence that showed "the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Feilen*, 965 F.2d at 672. In the face of this evidence, Fidelity had the burden of persuading the court of a different calculation. *Id.* Any conflict or ambiguity in the calculation of damages had to be resolved against Fidelity. *Roth v. Sawyer-Cleator Lumber Co*., 61 F.3d 599, 602 (8th Cir. 1995); *Bierwirth*, 754 F.2d at 1056; *Leigh*, 727 F.2d at 138–39.

Fidelity's arguments against the propriety of this damage calculation fail for the following reasons.

Appellate Case: 12-2060     Page: 90     Date Filed: 05/15/2013 Entry ID: 4035705

### 1. Fidelity failed to prove any benefit to the Plans from its float program.

Fidelity misleadingly suggests that all or some of the float interest was delivered to the Plans' investment options. Yet, Fidelity's sole witness (Gentile) admitted that not all investment funds participate in the float income program. Tr. 1186:24 – 1187:6. She could not even testify which, *if any*, of the Plans' investment funds participated in Fidelity's program. Tr. 1187:2–9. Fidelity produced *no evidence* that *any* of the Plans' investment options actually received *any* float income. Fidelity argues that the Plans were the sole investor in the Income Fund and thus must have been the sole beneficiary of any float interest allocated to the Income Fund, but Fidelity cites no evidence that the Income Fund in fact received any float income. *Cf.* Fidelity Br. 45–46. Moreover, Gentile admitted there was no way any participating investment fund could credit a plan for the float income generated from the use of that plan's assets. Tr. 1187:10–20, 1226:23 – 1227:1 (FDA282–83).

Fidelity also contends it received *no benefit* from its float program. That contention is absurd. *Cf.* Fidelity Br. 44. Gentile described a complex program to generate income from overnight repurchase agreements on billions of dollars of float. She admitted, "Fidelity has created this process so that *we can earn interest* on the money as it sits idle in the account or as the float." Tr. 1189:3–5 (emphasis added) (FDA258C). Since the float was a Plan asset, Fidelity was not entitled to

Appellate Case: 12-2060    Page: 91    Date Filed: 05/15/2013 Entry ID: 4035705

earn *any* of that interest. Moreover, if Fidelity's mutual funds participated in this float interest program, then Fidelity did make money from the program; it is irrelevant which Fidelity shell the money went through.

**2. Fidelity provided no evidence of any tax withholding that should have been deducted from the calculation of Plan losses.**

For the first time on appeal, Fidelity contends Plaintiffs' expert failed to credit tax withholdings that Fidelity made from participant distributions. Fidelity Br. 46–47. Fidelity presented no evidence of the amount of taxes withheld from participant distribution checks in these Plans. Instead, Fidelity only estimated the amount it withheld on *all* distribution checks it wrote in 2008 and delivered to the IRS: $2.8 billion (3% of $89 billion). Tr. 1204:21 – 1205:2. That is more than the entire asset value of the PRISM Plans. ASA874 ($1.7 billion). Fidelity did not indicate why 3% is the proper amount to deduct from distribution float for taxes. Moreover, while Fidelity stated that it pays the IRS immediately, it admitted it does not pay State taxes immediately, meaning it earns float income on those amounts too. Tr. 1217:2–13 (FDA273). This argument also fails to show any error in the damages calculation, much less the amount by which it allegedly should be adjusted.

The district court's damages award was not clearly erroneous. *Gonzalez*, 681 F.3d at 950, 952. Fidelity highlights only ambiguities in the calculation, and those ambiguities must be resolved against Fidelity, *Roth*, 61 F.3d at 602, especially

Appellate Case: 12-2060    Page: 92    Date Filed: 05/15/2013 Entry ID: 4035705

since Fidelity is the one who "made it difficult to disentangle commingled profits", *Leigh*, 727 F.2d at 139.

## V. The district court awarded reasonable attorney fees that were a fraction of Defendants' fees.

The district court's attorney fee award cannot be reversed in whole or in part unless the court abused its discretion. *Snider v. United States*, 468 F.3d 500, 511 (8th Cir. 2006)(*citing Kaffenberger v. United States*, 314 F.3d 944, 960 (8th Cir. 2003)). Attorney fee awards should not be a second major litigation. *Fox v. Vice*, 131 S.Ct. 2205, 2216 (2011). The district court need not engage in "green-eyeshade" accounting; it need only do "rough justice" in deciding on the fee to award. *Id.* at 2216.

The district court did not abuse its discretion in awarding Plaintiffs' attorneys $13 million in attorney fees. FDA390–403. That decision was amply supported by numerous declarations and exhibits (Docs. 650-1 – 650-40, CSA1–66), including the declarations of two nationally recognized ERISA litigation attorneys (SA47–53, SA54–62), 267 pages of detailed billing records (Doc. 651-1 (sealed)), and attorney fee awards to Plaintiffs' attorneys in other cases. Doc. 650-34; *Martin v. Caterpillar, Inc.*, No. 07-1009, Doc. 197 at 8 (C.D.Ill. Sep. 10, 2010); *Will v. Gen. Dynamics, Corp.*, No. 06-698, Doc. 259 at 6 (S.D.Ill. Nov. 22, 2010). That is reasonable compensation for the 25,161 hours of time Plaintiffs' attorneys spent litigating this case from October 2006 through May 2012. Doc. 651-1 (sealed);

Appellate Case: 12-2060     Page: 93     Date Filed: 05/15/2013 Entry ID: 4035705

CSA66 (¶239). That award is less than 1/3 of the value of all of the damages and equitable relief Plaintiffs' attorneys obtained for the Plans ($43 million). SA17; *see*, *e.g.*, *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1298 (11th Cir. 1999)(1/3 fee reasonable). It also is far less than $42.5 million in attorney fees that Defendants paid their own attorneys in this case. CSA92, CSA105; *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1220 (8th Cir. 1981)(comparison to defendants' fees is appropriate).

Further, notice was sent to 27,868 class members (Doc. 709 at 1) informing them of the requested fee amount and that an award may come from the class recovery if Defendants were not ordered to pay it. Docs. 666-1, 666-2; Doc. 683 at 2. Not one of the 27,868 participants objected to Plaintiffs' requested fee. Doc. 709 at 1.

Plaintiffs' litigation expenses alone were $2.2 million, which Plaintiffs' attorneys had to pay themselves and have yet to be reimbursed. SA18–20; SA35–41 (¶¶5–21). Plaintiffs' *total* litigation expenses were less than the cost of just *one* of Defendants' jointly presented expert witnesses and his research (Glenn Hubbard-$3.2 million). SA20; Tr. 2108–10. In fact, that one expert and his research cost more than *all* of Plaintiffs' *six* expert witnesses combined. SA40–41 (¶19). Plaintiffs' attorneys undertook monumental risk in undertaking this litigation, advancing millions in litigation expenses, and not being paid for years.

Appellate Case: 12-2060     Page: 94     Date Filed: 05/15/2013 Entry ID: 4035705

The district court provided Plaintiffs' attorneys no enhancement to the lodestar fee to account for this exceptional risk because, the court concluded, the national-rate based lodestar award "adequately compensates for the risk inherent in this type of litigation[.]" FDA398.

For all of these reasons, the district court's attorney fee award was reasonable and not an abuse of discretion. Defendants only challenge certain aspects of that award, which individually and in sum do not merit reversal or reduction in any respect.

### A.  The district court properly awarded a national billing rate. *ABB Issue 12.*

ABB objects to compensating Plaintiffs' attorneys at national billing rates. This clearly was national litigation meriting a national rate because Defendants' attorneys are from three large national firms with offices in Los Angeles, Boston, Philadelphia, and Washington D.C. This litigation is national in scope. *Torgeson v. Unum Life Ins. Co. of Am.*, 2007 U.S. Dist. LEXIS 9332, *21 (N.D.Iowa Feb. 5, 2007); *Mogck v. Unum Life Ins. Co. of Am.*, 289 F.Supp.2d 1181, 1191 (S.D.Cal. 2003); *Dobson v. Hartford Fin. Servs. Group, Inc.*, 2002 U.S. Dist. LEXIS 17682, *9 (D.Conn. Aug. 2, 2002). It concerned 401(k) plans of a multinational corporation with employees throughout the United States. ASA174 (¶7), ASA338–42. The benefits Plaintiffs' attorneys obtained for the PRISM Plans thus provided national benefits.

Appellate Case: 12-2060    Page: 95    Date Filed: 05/15/2013 Entry ID: 4035705

The national market is the appropriate market for this particular specialization. *Little Rock*, 674 F.3d at 997. Where plaintiffs' attorneys are "leaders in the field" and have "extensive experience" in a specialized area, they tend to be "able to handle the case in a shorter length of time than a local lawyer, without comparable experience," and so a higher, national rate is appropriate. *Planned Parenthood, Sioux Falls Clinic v. Miller*, 70 F.3d 517, 519 (8th Cir. 1995). Plaintiffs' attorneys are recognized by the AARP and others as *the* national leaders with the most extensive experience in this highly specialized area of ERISA litigation. SA57–60 (¶¶ 8–14); SA50–52 (¶¶ 14–26). They have litigated such cases in the Second, Third, Seventh, Eighth, and Ninth Circuits. No local counsel could have (or would have) undertaken this litigation. SA58 (¶10). They "handle[d] the case in a shorter length of time than a local lawyer", indeed in a shorter length of time even than Defendants' national lawyers. The 25,161 hours that Plaintiffs' attorneys spent prosecuting this case is *less than 1/4* of the hours Defendants' attorneys spent unsuccessfully defending this case. CSA92, CSA104. A reasonable rate thus is at least the national rate that Defendants attorneys charged for their less efficient work. "[T]he quality of a prevailing party's counsel's representation normally are {*sic*} reflected in the reasonable hourly rate." *Perdue v. Kenney A. ex rel. Winn*, 130 S.Ct. 1662 at 1673, 1674 n.5 (2010).

The district court awarded Plaintiffs attorney fees at a blended rate of $514.60

Appellate Case: 12-2060     Page: 96     Date Filed: 05/15/2013 Entry ID: 4035705

per hour, based on the evidence Plaintiffs provided and fee awards to Plaintiffs' attorneys in other courts. FDA395, FDA397. The court found that rate to align with rates charged in 2012 and to be comparable to the rates charged by Defendants' attorneys. FDA397. That comparison was an appropriate test of reasonableness. *Dependahl*, 653 F.2d at 1220; *Chi. Prof'l Sports Ltd. P'ship v. N.B.A.*, 1996 U.S. Dist. LEXIS 1525, *9 (N.D.Ill. Feb. 13, 1996)(*citing Henson v. Columbus Bank & Trust Co.*, 770 F.2d 1566, 1575 (11th Cir. 1985)).

ABB's cases are inapposite because they do not address the propriety of awarding a national rate (*Fish v. St. Cloud State Univ.*, 295 F.3d 849, 851 (8th Cir. 2002), *Farmers Coop. Co. v. Senske & Son Transfer Co.*, 572 F.3d 492, 500 (8th Cir. 2009)) or concern litigation over purely local matters such as State legislative districts or desegregation of public schools (*Emery v. Hunt*, 272 F.3d 1042, 1044 (8th Cir. 2001), *Little Rock*, 674 F.3d at 993). *Cf.* ABB Br. 59.

ABB also disputes the rates the district court included in its blended rate for what ABB improperly calls "document review attorneys[.]" ABB Br. 60; *cf.* CSA19–21 (¶¶ 75–83), CSA35–38 (¶¶136–53), CSA47–48 (¶¶182–86). It cites no authority that holds the attorneys ABB challenges must be paid at discounted rates, much less any authority that shows the district court's rejection of ABB's argument was an abuse of discretion. Moreover, as Plaintiffs explained in detail (and ABB does not refute), these challenged attorneys did far more than merely

Appellate Case: 12-2060    Page: 97    Date Filed: 05/15/2013 Entry ID: 4035705

review documents; they directly participated and assisted in the development of extensive litigation strategies unique to this case and engaged in in-depth and detailed tasks. CSA77–84 (¶¶ 37–69). They were employees on the payroll of Plaintiffs' law firm. SA63 (¶3). The district court properly rejected ABB's argument for a discounted rate for these attorneys.

**B. The district court properly held ABB and Fidelity jointly and severally liable for Plaintiffs' attorney fees.** *Fidelity Issue 4.*

The district court properly held ABB and Fidelity jointly and severally liable for payment of Plaintiffs' attorney fees and costs. *Concord Boat Corp. v. Brunswick Corp.*, 309 F.3d 494, 497 (8th Cir. 2002), *amended*, 318 F.3d 1156 (2003);[14] *Walker v. U.S. Dept. of H.U.D.*, 99 F.3d 761, 772–73 (5th Cir. 1996); *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1121–22 (5th Cir. 1995)(en banc); *Fenster v. Tepfer & Spitz, Ltd.*, 301 F.3d 851, 859–60 (7th Cir. 2002). Fidelity contends it should not be liable for any attorney fees because it was found not to be a fiduciary as to the breaches the district court found to have caused most of the Plans' losses. Fidelity Br. 47–49. Fidelity's attorney fee liability does not depend on how much loss it specifically caused. The district properly applied the factors of 29 U.S.C. §1132(g)(1) and *Leonard v. Southwestern Bell Corp. Disability Income*

---

[14] Fidelity criticizes reliance on *Concord* because it concerns costs instead of fees. That is a meaningless distinction, since *Concord* addresses the "general rule" of joint and several liability under Rule 54(d), 309 F.3d at 497, and Rule 54(d) governs both costs and attorney fees, Fed.R.Civ.P. 54(d).

Appellate Case: 12-2060     Page: 98     Date Filed: 05/15/2013 Entry ID: 4035705

*Plan*, 408 F.3d 528, 532 (8th Cir. 2005), in finding Fidelity should pay Plaintiffs'
attorney fees. FDA391–92. Fidelity shows no legal error in that analysis, much less
an abuse of discretion.

Fidelity contends it should not be liable for attorney fees incurred to prosecute
unsuccessful claims. Fidelity Br. 50–51. ABB makes no such contention. Plaintiffs
already deleted from their request all hours they expended on the issues on which
they did not prevail, including their efforts to prove Fidelity was a fiduciary.
CSA86–87 (¶¶79–82). The only fees Plaintiffs sought were fees that directly
related to claims on which Plaintiffs succeeded. *Id.* Fidelity has not identified any
time entry in Plaintiffs' detailed 267-page submission that it contends relates
exclusively to unsuccessful claims.

Fidelity contends it should not be liable for attorney fees incurred to prosecute
claims for which only ABB was held liable (what it calls "lineup-related
breaches"). Fidelity, however, vigorously litigated whether those actions were
breaches. In fact, Fidelity spent over *four times* the attorney hours (96,306) as ABB
(26,487) in litigating this case. CSA104, CSA92. Fidelity listed as *its* factual issues
for trial the core merits issues in the case: whether the Plans' investments violated
the IPS or were otherwise imprudent; whether Fidelity's recordkeeping
compensation was unreasonable; whether the Plans' revenue sharing was
reasonable; whether Fidelity provided ABB discounted corporate services in return

Appellate Case: 12-2060      Page: 99      Date Filed: 05/15/2013 Entry ID: 4035705

for high compensation in the Plans; and whether that influenced fiduciary decision-making. FDA165–67.[15] Fidelity presented two expert witnesses to opine that Fidelity's recordkeeping compensation was reasonable. Tr. 2051–2187; Tr. 3578–3690. Both ABB and Fidelity cross-designated each other's eight expert witnesses. Docs. 650-18, 650-19; Tr. 1707:22–25. Fidelity argued at closing that its recordkeeping fees were reasonable and disputed any connection between its fees and ABB's corporate services. Tr. 3803:12 – 3814:10, 3815:17 – 3825:25. Fidelity also submitted a 40-page trial brief that argued merits issues. Doc. 495. ABB's trial brief barely exceeded 16 pages. Doc. 496. ABB and Fidelity jointly submitted proposed findings and conclusions. Doc. 552. ABB and Fidelity had a joint defense agreement, Tr. 109:2–17, so Fidelity actively participated in arguing that the so-called "lineup-related breaches" were not breaches at all. Thus, although Fidelity does not have to pay the losses caused by those breaches, it failed in its contention that they were not breaches. Further, Fidelity caused Plaintiffs' attorneys to spend thousands of hours proving they were breaches just as much as did ABB. Fidelity fails to mention the substantial future benefits obtained for the participants by the court's non-monetary plan reformation.

    For all of these reasons, there was ample basis for holding Fidelity jointly and

---

[15]  In fact, Fidelity lists twice as many factual issues it intended to address at trial as ABB. FDA164–67. It also listed twice as many legal issues it intended to address at trial. FDA170–72.

Appellate Case: 12-2060     Page: 100     Date Filed: 05/15/2013 Entry ID: 4035705

severally liable for those attorney fees.

Fidelity also neglects the fact that this trial (and the judgment against Fidelity alone) would not have happened without massive pretrial litigation, including pre-complaint investigation, preparing the complaint, surviving three motions to dismiss, obtaining class certification (and succeeding on the resulting appeal), surviving summary judgment motions, surviving *Daubert* challenges, and conducting numerous depositions. *See* FDA13–68; CSA7–8 (¶19). Plaintiffs' attorneys spent nearly five times as many hours on those issues as they did actually preparing for and trying this case. CSA61–64 (¶238). Fidelity vigorously fought Plaintiffs in all of that. Fidelity unsuccessfully sought to exclude the trial testimony of Plaintiffs' expert witnesses (Docs. 260–71), including the testimony of Otto and Pomerantz (Docs. 268–71), which the district court found reliable and convincing for calculating *all* of the Plans' losses. FDA323, FDA325, FDA375–77, FDA380. Fidelity filed an 83-page motion for summary judgment contending primarily that the Plans' fees were reasonable. Doc. 283 (sealed). Fidelity thus was jointly responsible with ABB for Plaintiffs' attorney fees and costs and properly was held jointly liable with ABB for paying those fees and costs.

Fidelity claims that the fees incurred on "lineup-related theories" were somehow "easily separable" from "float-related theories", but it does not even suggest how to do that. It does not even specify an amount or percentage of the

Appellate Case: 12-2060    Page: 101    Date Filed: 05/15/2013 Entry ID: 4035705

awarded attorney fees it should not have to pay, much less justify that amount.

The overarching virtue of a joint and several fee award is that it takes the court (and Plaintiffs) out of the arcane mathematics of figuring out how to split the fees between ABB and Fidelity. ABB and Fidelity can figure out between themselves how to split these fees. Leaving them to do that accords with the Supreme Court's admonition against turning attorney fee awards into a second major litigation with green-eyeshade accounting. *Fox*, 131 S.Ct. at 2216; *see also Concord*, 309 F.3d at 497 ("The companies could allocate the risk of costs among themselves, or any party satisfying the judgment could seek contribution from the others"); *Walker*, 99 F.3d at 773 ("the wrongdoers [] can file contribution actions against their co-wrongdoers and allocate fault among themselves").

The district court's award of attorney fees and costs should be affirmed in all respects.

## CONCLUSION

The district court's judgment should be affirmed in all respects.

Appellate Case: 12-2060    Page: 102    Date Filed: 05/15/2013 Entry ID: 4035705

May 13, 2013                    Respectfully submitted,

                               /s/ Jerome J. Schlichter
                               Jerome J. Schlichter
                               Troy A. Doles
                               Heather Lea
                               Michael A. Wolff
                               100 South Fourth Street, Suite 900
                               Saint Louis, Missouri 63102
                               (314) 621-6115

                               *Attorneys for Plaintiffs-Appellees*

Appellate Case: 12-2060    Page: 103    Date Filed: 05/15/2013 Entry ID: 4035705

# CERTIFICATES OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed.R.App.P. 32(a)(7)(B), as amended by the Court's order of May 13, 2013, because this brief contains 20,996 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5), and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2010 in Times New Roman 14 point font.

3. This brief has been scanned for viruses and is virus-free.

/s/ Jerome J. Schlichter
Attorney for Plaintiffs-Appellees
Dated: May 13, 2013

Appellate Case: 12-2060    Page: 104    Date Filed: 05/15/2013 Entry ID: 4035705

## CERTIFICATE OF SERVICE

I certify that on May 13, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ Jerome J. Schlichter