IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

———————————————

RONALD TUSSEY, ET AL.,

*Plaintiffs-Appellees,*

v.

FIDELITY MANAGEMENT TRUST COMPANY
AND FIDELITY MANAGEMENT & RESEARCH COMPANY,

*Defendants-Appellants.*

———————————————

On Appeal From The United States District Court
For The Western District Of Missouri
Hon. Nanette K. Laughrey, District Judge

———————————————

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS
## FIDELITY MANAGEMENT TRUST COMPANY AND
## FIDELITY MANAGEMENT & RESEARCH COMPANY

———————————————

RICHARD N. BIEN
LATHROP & GAGE, LLP
2345 Grand Boulevard
Suite 2800
Kansas City, Missouri 64108

JONATHAN D. HACKER
*Counsel of Record*
BRIAN D. BOYLE
KATHRYN E. TARBERT
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300

*Attorneys for Defendants-Appellants Fidelity Management Trust Company
and Fidelity Management & Research Company*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................1

ARGUMENT .......................................................................4

I.    FIDELITY DID NOT BREACH ANY FIDUCIARY DUTY IN
ITS HANDLING OF FLOAT INCOME .......................................4

    A.    Depository And Redemption Float Are Not Plan Assets.....................4

        1.    Depository Float.........................................................4

        2.    Redemption Float .......................................................9

    B.    Fidelity Did Not Take Or Benefit From Float Income ......................13

II.    PLAINTIFFS' CLAIMS ARE TIME-BARRED .........................................17

III.    THE DISTRICT COURT'S AWARD OF DAMAGES
CANNOT BE SUSTAINED ........................................................22

    A.    The Award Necessarily Gives Plaintiffs A Prohibited
Double Recovery...................................................................22

    B.    The Award Ignores Tax Withholding ...............................................26

IV.    THERE IS NO BASIS FOR HOLDING FIDELITY JOINTLY
AND SEVERALLY LIABLE FOR ATTORNEYS' FEES .........................27

CONCLUSION ...................................................................30

Appellate Case: 12-2060    Page: 2    Date Filed: 07/01/2013   Entry ID: 4050744

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adamson v. Armco, Inc.*,
  44 F.3d 650 (8th Cir. 1995) ...............................................................18

*Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*,
  941 F.2d 561 (7th Cir. 1991) .........................................................6, 7

*Borntrager v. Cent. States Se. and Sw. Areas Pension Fund*,
  577 F.3d 913 (8th Cir. 2009) .................................................................9

*Brown v. Medtronic, Inc.*,
  628 F.3d 451 (8th Cir. 2010) ...............................................................25

*Coats v. Penrod Drilling Corp.*,
  61 F.3d 1113 (5th Cir. 1995) ...............................................................29

*Concord Boat Corp. v. Brunswick Corp.*,
  309 F.3d 494 (8th Cir. 2002) ...............................................................29

*David v. Alphin*,
  704 F.3d 327 (4th Cir. 2013) ........................................................18, 19

*Donovan v. Bierwirth*,
  754 F.2d 1049 (2d Cir. 1985) ...............................................................25

*Fenster v. Tepfer & Spitz, Ltd.*,
  301 F.3d 851 (7th Cir. 2002) ...............................................................29

*George v. Kraft Foods Global, Inc.*,
  641 F.3d 786 (7th Cir. 2011) ...............................................................10

*Gonzalez v. United States*,
  681 F.3d 949 (8th Cir. 2012) ...............................................................22

*Hardt v. Reliance Standard Life Ins. Co.*,
  130 S. Ct. 2149 (2010)........................................................................27

*Harms v. Cavenham Forest Indus., Inc.*,
  984 F.2d 686 (5th Cir. 1993) ...............................................................23

Appellate Case: 12-2060    Page: 3    Date Filed: 07/01/2013 Entry ID: 4050744

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Hintz v. JPMorgan Chase Bank, N.A.*,
686 F.3d 505 (8th Cir. 2012) ............................................................................8

*In re Interstate Bakeries Corp.*,
704 F.3d 528 (8th Cir. 2013) ...........................................................................27

*Janus Capital Grp., Inc. v. First Derivative Traders*,
131 S. Ct. 2296 (2011).....................................................................................14

*Kitterman v. Coventry Health Care of Iowa, Inc.*,
632 F.3d 445 (8th Cir. 2011) ...........................................................................17

*Larson v. Northrop Corp.*,
21 F.3d 1164 (D.C. Cir. 1994).........................................................................21

*Leigh v. Engle*,
727 F.2d 113 (7th Cir. 1984) .....................................................................22, 25

*Mahoney v. J.J. Weiser & Co.*,
564 F. Supp. 2d 248 (S.D.N.Y. 2008),
*aff'd*, 339 F. App'x 46 (2d Cir. 2009).............................................................20

*Martin v. Feilen*,
965 F.2d 660 (8th Cir. 1992) .....................................................................24, 25

*Roth v. Sawyer-Cleator Lumber Co.*,
61 F.3d 599 (8th Cir. 1995) ..............................................................................25

*SEC v. Steadman*,
798 F. Supp. 733 (D.D.C. 1991), *aff'd in relevant part,* 967 F.2d 636
(D.C. Cir. 1992) .................................................................................................5

*Shrader v. OMC Aluminum Boat Grp., Inc.*,
128 F.3d 1218 (8th Cir. 1997) .........................................................................28

*Tibble v. Edison Int'l*,
711 F.3d 1061 (9th Cir. 2013) .............................................................19, 20, 21

*Walker v. HUD*,
99 F.3d 761 (5th Cir. 1996) ..............................................................................29

Appellate Case: 12-2060     Page: 4     Date Filed: 07/01/2013 Entry ID: 4050744

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Walter v. United States*,
　148 F.3d 1027 (8th Cir. 1998) ...............................................................9

*Weitz Co., LLC v. Lloyd's of London*,
　574 F.3d 885 (8th Cir. 2009) .................................................................8

*Whitfield v. Cohen*,
　682 F. Supp. 188 (S.D.N.Y. 1998) ...............................................19, 20

**STATUTES**

15 U.S.C. § 80a-15(a)(2) ........................................................................14

15 U.S.C. § 80a-30 .................................................................................15

29 U.S.C. § 1103(c)(1) ...........................................................................16

29 U.S.C. § 1104 ....................................................................................16

29 U.S.C. § 1113(1) ...............................................................................17

**REGULATIONS**

12 C.F.R. § 330.5(b)(1) ............................................................................4

17 C.F.R. § 210.3-01 ..............................................................................15

17 C.F.R. § 210.6-01 ..............................................................................15

17 C.F.R. § 270.0-1(a)(7)(i) ...................................................................14

17 C.F.R. § 270.30b1-5 ..........................................................................15

29 C.F.R. § 2510.3-102(a)(1) ...................................................................7

**OTHER AUTHORITIES**

DOL Adv. Op. 93-24A ...........................................................................11

DOL Information Letter (Aug. 11, 1994) ...............................................11

FASB ASC 962-205-45-1 .........................................................................6

Appellate Case: 12-2060　　Page: 5　　Date Filed: 07/01/2013 Entry ID: 4050744

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

FASB ASC 962-325-25-1 ............................................................................................6

Fidelity Magellan Fund Registration Statement, May 30, 2007 ..............................14

Appellate Case: 12-2060     Page: 6     Date Filed: 07/01/2013 Entry ID: 4050744

# INTRODUCTION

The district court held that the Fidelity defendants (collectively "Fidelity") breached fiduciary duties in their handling of "float" income. That holding is contrary to law, logic, and the plan document. Plaintiffs' response brief ("PB") fails to show otherwise.

Plaintiffs' central thesis is that contribution moneys (and income earned on them) belong to the Plan "from the point they leave the employer's account to the point they enter an investment fund's account or a distributee-participant's personal account." PB20; *see* PB69. In other words, plaintiffs contend that "depository float" belonged to the Plan until it was delivered to the investment option's account, and "redemption float" belonged to the Plan until it was delivered to the participant's account.

The first point flatly concedes away plaintiffs' case on depository float. It is undisputed that once contributions left the employer's account, they were deposited in an omnibus account (the Depository Account) that was *registered on behalf of the investment options*, which paid the account fees and bore the risk of loss in the account funds. Funds in the Depository Account thus had *already* "enter[ed] an investment fund's account," and no longer belonged to the Plan on plaintiffs' own theory. Plaintiffs also do not dispute that by 4 p.m. that same day,

the Plan became owner of the shares. Once the money was exchanged for shares, the Plan owned the shares, not the money used to purchase them.

On redemption float, plaintiffs ignore the same dispositive, undisputed fact they overlook on depository float: the Redemption Account was registered on behalf of the investment options, which bore the account fees and risk of loss. Because the Plan lacked any indicia of ownership in that account, the Plan cannot claim any legal entitlement to income from account funds. And plaintiffs affirmatively concede that individual participants cannot claim interest on funds represented by uncashed checks. PB71. By omission and concession, then, plaintiffs' brief confirms that redemption float income does not belong to the Plan or its participants.

Beyond the glaring gaps and flaws in plaintiffs' own brief, there is the Department of Labor ("DOL") amicus brief—the dog that did not bark. Plaintiffs' float argument rests entirely on DOL guidance statements that do not speak to the issue here, as DOL itself tacitly confirms: having made the significant effort to file an amicus brief addressing multiple practices and issues DOL is concerned about, DOL chose not to quarrel at all with Fidelity's float practices. DOL's continued silence speaks volumes about the merits of plaintiffs' float arguments.

Plaintiffs' limitations argument fares no better. Plaintiffs' expert submitted calculations addressing Fidelity's float practices as far back as 1995, more than six

2

years before the complaint here was filed. As the Fourth and Ninth Circuits recently held, ERISA does not permit plaintiffs to treat those practices as a "continuing violation" that effectively retriggers the limitations period every moment the practices remain in place. And again, while DOL's brief argues that plaintiffs' claims against *ABB* are timely under those recent decisions because ABB first added challenged funds within the limitations period, nowhere does DOL's brief suggest that the Fourth or Ninth Circuits erred, or that a challenge to float practices implemented *before* the limitations period can survive those precedents.

Finally, plaintiffs offer no serious defense of the district court's decision holding Fidelity jointly and severally liable with ABB for the entire $13.5 million attorneys' fees award. Remarkably, plaintiffs deny that the fee award holds Fidelity liable for fees incurred to prosecute unsuccessful claims. But that is *exactly* what it does: almost every penny of the award covers fees incurred to litigate claims that were not successful against Fidelity. Plaintiffs argue that Fidelity should be held liable because their claims were successful *against ABB*, but that success only justifies a fee award *against ABB*. As against Fidelity, plaintiffs at most are entitled to a fee award limited to their prosecution of the successful float claims, and they nowhere deny that those claims represent a comparatively minuscule portion of their attorneys' time.

3

# ARGUMENT

## I. FIDELITY DID NOT BREACH ANY FIDUCIARY DUTY IN ITS HANDLING OF FLOAT INCOME

### A. Depository And Redemption Float Are Not Plan Assets

#### 1. *Depository Float*

Plaintiffs contend that the Plan was entitled to income from overnight investments of depository float because that float belonged to the Plan until it "enter[ed] an investment fund's account." PB20, *see* PB68-69. That contention is flawed in three respects.

*First*, it conclusively refutes plaintiffs' own position. It was undisputed at trial, and the district court expressly found, that employer contributions were deposited into an omnibus account—the Depository Account—which was registered "*for the benefit of the investment options* in which Plan participants may choose to invest." FDA367 (emphasis added); *see* FDA257. The investment options paid the fees for that Account and bore the risk of loss of funds in that account. Fidelity Opening Brief ("FB") 33. Additionally, Federal Deposit Insurance Corporation regulations insured the funds in the account for the investment options. *See* 12 C.F.R. § 330.5(b)(1). On the undisputed facts, in other words, every pertinent indicium of ownership favors the investment options.

4

FB29.[1]  And plaintiffs' own theory is that once the funds enter an investment option's account, they no longer belong to the Plan.  It follows from plaintiffs' own theory that once funds entered the Depository Account, they were no longer Plan assets.[2]

Although plaintiffs are less explicit, they appear to be relying on the same invalid distinction the district court drew, i.e., funds in the omnibus Depository Account were Plan assets, but then ceased being Plan assets when they were transferred to individual investment-option accounts.  FDA370-71.  Plaintiffs identify no basis for distinguishing between the accounts under ordinary property law.  And in fact many of the investment options *continued to hold their moneys in shared accounts* even after that money was transferred out of the Depository Account.  FDA266-67, 370-71.  Yet plaintiffs necessarily concede that funds in those shared accounts were no longer plan assets.  There is no difference for the investment options' shared Depository Account.  Funds ceased being Plan assets

---

[1] As one court explained when considering regulatory requirements for a similar account used to facilitate subscriptions to and redemptions from mutual funds, "it is unclear who does have an interest in [the account] monies if not the Funds." *SEC v. Steadman*, 798 F. Supp. 733, 739-40, 746 (D.D.C. 1991), *aff'd in relevant part,* 967 F.2d 636, 646 (D.C. Cir. 1992).

[2] Any construction of Depository Account funds as belonging to the Plan also would contradict the Trust Agreement's explicit restrictions on holding Plan assets in the form of cash.  *See infra* at 12.

5

when they entered that Account—not later, when they were transferred to other shared or individual investment option accounts.

*Second*, plaintiffs ignore the closely related, undisputed point that on the same day cash enters the Depository Account, the Plan becomes owner of the specific investment-option shares it ordered. Plaintiffs do not and could not deny that the Plan owns the shares as of 4 p.m. on the trade date—not on a later date after being transferred to some other account. FB12-13, 25-26.[3] At the moment the Plan became owner of the shares, it relinquished ownership interest in the money used to purchase them, as the Seventh Circuit made clear in *Associates in Adolescent Psychiatry, S.C. v. Home Life Insurance Co*., 941 F.2d 561 (7th Cir. 1991). Plaintiffs try to distinguish *Associates* on the ground that the trustee there "handled the *insurance company's* funds, not plan assets" (PB72), but that is precisely the point. The insurance company in *Associates* was in the same position as the investment options here—the plan assets were being invested in the insurance company's annuities. And the court held that the float was not a plan asset because the plan was credited with the annuity purchases "as soon as" the

---

[3] Generally accepted accounting principles established by the Financial Accounting Standards Board ("FASB") likewise require ERISA-governed plans to prepare financial statements by using the accrual-basis method, which "requires that purchases and sales of securities be recorded on a trade-date basis." FASB ASC 962-205-45-1; 962-325-25-1.

6

plan transferred the funds, even though the insurance company did not ultimately receive the funds until a later date. 941 F.2d at 564.

The same is true here: the Plan's account was credited with the selected investment-option shares the same day contributions were made. *Associates* thus confirms what common sense instructs and property law dictates: after the Plan received the benefit of its purchase and became owner of the investment options' shares, the Plan did not remain entitled to ownership of the funds used to make that purchase.

*Third*, plaintiffs' theory that the Plan simultaneously owned the investment-option shares and the money used to purchase them finds no support in the one DOL regulation they cite, 29 C.F.R. § 2510.3-102(a)(1).[4] That regulation merely declares that contributions are deemed to be plan assets as of the date they can be understood as segregated from the employer's account. That regulation is uncontroversial and irrelevant. The issue here is not when contributions become plan assets, but whether they *remain* plan assets *after* they are deposited in the investment options' Depository Account and thereby used to purchase the Plan's investment-option shares. That question is not answered or even addressed by the

---

[4] Plaintiffs cite two other public DOL comments from 1993 and 1994. Those comments are addressed below in connection with redemption float.

Appellate Case: 12-2060    Page: 13    Date Filed: 07/01/2013 Entry ID: 4050744

DOL regulation plaintiffs cite. It is instead governed by the ordinary rules of property law plaintiffs consciously ignore.

Plaintiffs refuse to address those ordinary property law rules in part because plaintiffs say Fidelity did not cite them in its float arguments below. PB67. But this Court has repeatedly recognized the "difference between a new argument and a new issue"—a newly raised *issue* may be waived, but a new *argument* in support of a preserved issue is "not barred from review." *Hintz v. JPMorgan Chase Bank, N.A.*, 686 F.3d 505, 508 (8th Cir. 2012); *see Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 890-91 (8th Cir. 2009). The "issue" on appeal here is whether Fidelity breached any duties to the Plan in its handling of float—and Fidelity consistently argued below that it did not. *See* Dkt. No. 552 ¶¶ 4, 119 (facts), ¶ 18 (law). Fidelity was not required to incant the magic words "ordinary notions of property rights" in the district court to permit reference to that principle on appeal. This is especially so given that plaintiffs raised the float theory upon which the district court ruled only after trial, in a brief to which Fidelity had no opportunity to reply. FB11.[5] Now that the issue can be fully joined, it would be absurd and unfair to ignore the legal rules that govern the issue.

---

[5] Even if ordinary property rules were new issues on appeal, this Court would be free to consider them, because they require no additional factual development or argument, and a manifest injustice would result from failure to

8

2. *Redemption Float*

The Plan also did not own redemption float. The district court concluded otherwise, but with no explanation of how or why. FB18-19, 32-33; *see* FDA368-72. Plaintiffs do not deny that a judgment without supporting legal analysis cannot be sustained. FB33. And their suggestion that "there is no significant difference" between depository and redemption float (PB 70) is belied by their own briefing of the issues. PB68-69 (citing different regulations and authorities as relevant to each type of float).

Plaintiffs now concede that a participant who receives a check supported by funds in the Redemption Account is not entitled to interest on "the funds represented by the check." PB70. Plaintiffs instead argue that the funds supporting a redemption check belong to *the Plan* until the participant cashes the check. PB70-71. Plaintiffs ignore the same dispositive fact they ignore with respect to depository float: the Redemption Account was registered for the benefit of the investment options (FDA368), which paid the fees and bore the risk of loss, thereby protecting the Plan from depletion of the Account through bank failure, mistake, or defalcation. *See supra* at 4-5; FB15, 33. Because neither the Plan nor the participants bore any risk of loss, they cannot claim the benefits of

apply the controlling rules. *Borntrager v. Cent. States Se. and Sw. Areas Pension Fund*, 577 F.3d 913, 923-24 (8th Cir. 2009).

9

ownership—such as interest or investment income—under ordinary notions of property rights. FB29; *supra* at 4-5. As with the Depository Account, the undisputed facts related to the indicia of ownership preclude any argument that the float belonged to the Plan.

Again avoiding ordinary property law principles of ownership, plaintiffs instead rely on authorities involving a different issue. The scenario they address is exemplified by *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011). In that case, the plan held assets in one account, and when the plan itself issued a distribution check to a participant, the assets were moved to a separate account also owned by the plan, from which the check amount was paid. *Id.* at 800. By agreement with the plan, the bank retained income from the second plan account (income earned while checks written on that account remained uncashed); absent that agreement, the court observed, the income would belong to the plan. *Id.*

That scenario is inapposite because unlike the accounts in *George*, the Redemption Account here does *not* belong to the Plan or contain Plan assets, for the reasons explained. And nothing in *George* suggests otherwise—*George* simply does not address the question whether (and when) float qualifies as a plan asset.

Exactly the same is true for the two decades-old DOL statements plaintiffs cite, 1993 Advisory Opinion 93-24A and a 1994 Information Letter (which was simply a follow-up to Advisory Opinion 93-24A). They both address the basic

10

scenario involved in *George*, i.e., a trustee retaining income earned from a float account. Adv. Op. 93-24A, at 1; DOL Information Letter (Aug. 11, 1994), http://www.dol.gov/ebsa/regs/ILs/il081194.html ("1994 Info. Letter"). And DOL's focus was solely on whether the trustee could *retain that income* (thereby benefitting from its work for the plan), not on whether the assets in the account qualified as plan assets. Indeed, in the 1994 Letter DOL specifically stated that it was irrelevant whether a particular account technically contained plan assets. 1994 Info. Letter. Here, of course, Fidelity indisputably did *not* retain any float income. *See infra* at 13. And because both DOL statements were focused on that distinct, inapposite issue, neither says anything about whether and when a given float account contains plan assets.

DOL's position remained the same eight years later, when it issued Field Assistance Bulletin 2002-3. That bulletin again addressed solely the *retention* of float income by a service provider, and conspicuously avoided addressing whether and when float bank accounts constitute plan assets.

In short, DOL did not take the opportunity to address the question at issue in this case in 1993, 1994, or 2002. And it has again foregone that opportunity in its amicus brief here. Plaintiffs err in relying on DOL for their float arguments.

Plaintiffs also err in asserting that while the parties could have negotiated a different arrangement, the Trust Agreement here required Fidelity to treat

11

depository and redemption float as a cash asset belonging solely to the Plan. PB71-72. The opposite is true: the Agreement in fact *prohibited* Fidelity from holding plan assets in cash or cash balances unless the Plan sponsor specifically authorized it. FDA433 (Trust Agreement § 4(k)(iv)). The Plan instead required Fidelity to hold plan assets only in the form of selected investment options.[6] The Plan thus could have accused Fidelity of violating the Trust Agreement if Fidelity had treated cash in the Redemption Account as a Plan asset (and surely would have done so if the bank had failed, as so many did during the class period).

Given the Trust Agreement's explicit direction that the Plan would not hold direct interests in cash deposits, it is unsurprising—and irrelevant—that the Trust Agreement did not expressly invoke the term "float." PB71. Float arises as a consequence of cash in transition between accounts, and the parties agreed the Plan would not handle cash. Redemption float, like depository float, did not belong to the Plan.

---

[6] FDA423 (providing that Fidelity will "hold and invest the aforesaid plan assets in trust among several investment options selected by the Name Fiduciary"); FDA425 (Trust Agreement § 4(c)) (providing for contributions to be invested in specified default investment option "[i]n the event that the Trustee fails to receive a proper direction" for how funds should be invested).

Appellate Case: 12-2060    Page: 18    Date Filed: 07/01/2013 Entry ID: 4050744

## B.    Fidelity Did Not Take Or Benefit From Float Income

Even if the float here were a Plan asset, there still would be no fiduciary breach because Fidelity did not take or benefit from it.  FB37-40.  Plaintiffs assert otherwise (PB14, 77), but the assertion contradicts the undisputed record.  Indeed, plaintiffs themselves argued in their post-trial brief that Fidelity breached its duties *not* by taking float income itself, but by distributing it to the Plan's investment options.  FDA210-11, 244-45 (¶¶ 28, 38).  The district court agreed that Fidelity did not take float income itself.  FDA370, 372-74.

In now asserting that Fidelity kept and used float income itself, plaintiffs appear to mean three different things.  None is correct.

*First*, plaintiffs at one point insinuate that Fidelity literally captured float income for itself (PB77), but the only evidence they cite is testimony by Brigitte Gentile that Fidelity developed the process so that "we can earn interest" on the float.  FDA258c.  By "we" Gentile obviously did not mean Fidelity earned interest *on its own behalf*, or that Fidelity *kept* the interest.  In her very next answer— omitted, remarkably, from plaintiffs' brief—Gentile explained that the interest was used to pay "bank expenses" on the float accounts and was then distributed "to the investment options."  FDA258c.  The district court accepted that uncontradicted testimony as fact.  FDA370, 372-74.

13

*Second*, plaintiffs suggest that Fidelity kept float income for itself when it distributed float income to Plan investment options that purportedly were merely Fidelity "shell[s]." PB78. That contradicts the district court's factual findings and Corporate Law 101. The investment options advised by Fidelity are SEC-registered mutual funds *owned by public shareholders*. And the district court found that the income was distributed not to Fidelity's benefit, but "to the benefit of all shareholders of the investment option[s]" (which include the Plan). FDA370. Plaintiffs have not challenged that finding on appeal.

Nor could they. A mutual fund is a separately incorporated entity that is owned exclusively by its shareholders (including 401(k) plans like the ABB Plan here). *See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2299 (2011). When a fund engages an investment adviser as a service provider, "the two entities maintain legal independence." *Id.* Federal law requires that mutual funds be governed by a board of trustees with a significant portion of independent trustees, *see* 17 C.F.R. § 270.0-1(a)(7)(i) ("at least seventy-five percent of the directors of the fund" must be disinterested), and specifically requires that investment advisory agreements be approved at least annually by the board. 15 U.S.C. § 80a-15(a)(2). The Fidelity funds in particular have more independent board members than the governing statute and regulation require. *See*, *e.g.*, Fidelity Magellan Fund Registration Statement, May 30, 2007 (9 of 11

14

trustees independent).[7]   The funds are also subject to their own accounting rules,
*see* 17 C.F.R. § 210.6-01 to -10, quarterly and semiannual financial reporting
requirements, *see* 15 U.S.C. § 80a-30; 17 C.F.R. § 270.30b1-5, and annual
independent audit requirements, 17 C.F.R. § 210.3-01.

There is accordingly no legal or factual basis for concluding that anybody
other than the shareholders of the mutual funds and other investment options in the
Plan benefited from the distribution of float income to those options.[8]

*Third*, and finally, plaintiffs suggest that Fidelity used float income for its
own purposes to the extent the income was used to pay bank fees associated with
the Depository and Redemption Accounts.  But because those accounts were
registered for the benefit of the Plan's investment options, the account fees
logically were the responsibility of the options, and it was thus appropriate for
those fees to be paid by the investment options out of their float income.

---

[7] *Available at*
http://www.sec.gov/Archives/edgar/data/61397/000006139707000004/main.htm.

[8] To the extent plaintiffs are suggesting Fidelity benefitted because the
distribution of float to the funds increased the funds' assets, resulting in marginally
increased fees for Fidelity as fund adviser, that suggestion comes to nothing.  If
float income had been distributed to the Plan, it necessarily would have been
immediately invested in the options, as required by the Trust Agreement (*see supra*
at 12), increasing fund assets (and hence the fund adviser fees) by essentially the
same amount.

15

Even if plaintiffs were correct in arguing that the float income belonged to the Plan, they would still be wrong about the bank fees. Payment of those fees benefitted the Plan, not Fidelity. Plaintiffs do not deny that, as the district court recognized, ERISA permits a fiduciary to use the "'assets of a plan'" for the purpose of "'defraying reasonable expenses of administering the plan.'" FDA372 (quoting 29 U.S.C. § 1103(c)(1)); *see* 29 U.S.C. § 1104. But like the district court, plaintiffs misconstrue the Trust Agreement as prohibiting Fidelity from using float income for that purpose. Section 6 of the Agreement, in fact, states that "[a]ll expenses of the Trustee relating directly to the acquisition and disposition of investments constituting part of the Trust ... shall be a charge against and paid from the appropriate Plan participants' accounts." FDA435. This is the only provision of the Trust Agreement that by its terms governs Fidelity's "Compensation and Expenses," yet it was inexplicably ignored by the district court. *See also* FDA433 (Trust Agreement § 4(k)(vii)) (authorizing Fidelity to "pay ... reasonable expenses and compensation from the Trust" for "legal, accounting, clerical, and other assistance" not funded by ABB); FDA424 (Trust Agreement § 1) (providing that assets in the Plan consist of contributions "less the payments that are made by the Trustee as provided herein").

Plaintiffs accuse Fidelity of "cobbl[ing] together" various portions of the Agreement to justify the use of float to defray account expenses (PB72), but that

16

objection is merely another way of saying *multiple provisions of the Agreement* authorize the practice. *See Kitterman v. Coventry Health Care of Iowa, Inc*., 632 F.3d 445, 448-49 (8th Cir. 2011) (court must "give[] effect to all parts of the contract" and read each provision "consistently with the others and as part of an integrated whole" (internal quotation marks omitted)). Nothing in the "two-page list of fees" on which plaintiffs rely (PB71)—a schedule attached to the Agreement—purports to relieve the Plan of the obligation to bear expenses related to Plan investments. Even if float were a plan asset, accordingly, there was no breach in using float income to defray the fees charged by third parties to operate omnibus transit accounts maintained for the Plan's investment options.

## II.  PLAINTIFFS' CLAIMS ARE TIME-BARRED

ERISA's six-year statute of repose prohibits the filing of a fiduciary-breach claim more than six years after "the last action which constituted a part of the breach or violation." 29 U.S.C. § 1113(1). Plaintiffs here challenge float-income practices indisputably implemented more than six years before the complaint was filed; plaintiffs do *not* base their challenge on changed circumstances arising within the limitations period that triggered some duty on Fidelity's part to revisit those practices. FB42 n.19. Accordingly, the "last action which constituted a part of the breach" occurred before the limitations period, and thus plaintiffs' challenge is barred.

17

Plaintiffs offer three responses, none of which has merit.  *First*, plaintiffs say there is no evidence that the challenged float income practices were adopted outside the limitations period.  PB73 (quotations omitted).  Wrong.  That fact was established by *plaintiffs' own witness*, Albert Otto, who submitted damages calculations addressing Fidelity's float practices "going back to 1995."  FDA295-96.

*Second*, plaintiffs assert that ERISA recognizes the "continuing violation" doctrine, pursuant to which a practice that constitutes a breach of fiduciary duty continually retriggers the limitations period so long as the practice remains in place.  Wrong again.  Courts—including this Court—have repeatedly held that ERISA does *not* recognize the continuing violation limitations doctrine.  FB41-42.[9] Just this year, the Fourth Circuit declared the doctrine to be "untenable," *David v. Alphin*, 704 F.3d 327, 341 (4th Cir. 2013), and the Ninth Circuit even more

---

[9] Plaintiffs erroneously describe *Adamson v. Armco, Inc.*, 44 F.3d 650 (8th Cir. 1995), as making only a "passing reference" to continuing violations, limited to state law.  PB74.  In fact the Court *squarely rejected* the plaintiff's effort in that case to invoke the continuing violation doctrine.  44 F.3d at 653-54.  While it did so in the context of a borrowed state-law limitations period, the Court was addressing the nature of the plaintiff's ERISA claim, holding that it was fully accrued when benefits were cut off years ago, and that the defendant's failure to pay proper benefits in the years thereafter, up to the point of suit, did not restart the limitations period.  *Id.*  If plaintiffs here were correct, the case would have come out the other way, because the continuing duty of fiduciaries to ensure the payment of proper benefits would perpetually retrigger any limitations period (whether state or federal).

Appellate Case: 12-2060     Page: 24     Date Filed: 07/01/2013 Entry ID: 4050744

recently explained that it would "make hash out of ERISA's limitation period and lead to an unworkable result," *Tibble v. Edison Int'l*, 711 F.3d 1061, 1068 (9th Cir. 2013). DOL, for its part, does not challenge the result or reasoning in *David* and *Tibble*. DOL instead simply argues that the claims against ABB are timely under those precedents, on the ground that ABB added challenged funds during the limitations period. DOL does not and could not make any such argument for the float-related claims against Fidelity. And plaintiffs point to no float-related triggering event that would save their claims under *David* and *Tibble*.

Lacking any supporting circuit precedent, plaintiffs highlight several district court cases that ostensibly recognize and apply the continuing violation doctrine. PB60. Plaintiffs misconstrue those cases. None of them embraces—*or even mentions*—the continuing violation theory. Indeed, only one addresses limitations issues at all, but its discussion is irrelevant to this case. *See Whitfield v. Cohen*, 682 F. Supp. 188, 197 (S.D.N.Y. 1998) (plaintiffs' challenge to fiduciary breach occurring 3.5 years before suit's filing was not time-barred).

Plaintiffs consider the cases significant because they recognize that ERISA's fiduciary duties have a continuing nature, but Fidelity has no quarrel with that proposition. To retrigger the statute of limitations, however, there must be some change in circumstances that requires the fiduciary to act in response, *see Tibble*, 711 F.3d at 1068; *David*, 704 F.3d at 341, as even cases cited by plaintiffs

19

recognize, *see Mahoney v. J.J. Weiser & Co.*, 564 F. Supp. 2d 248, 259 (S.D.N.Y. 2008) (breach of "continuing duty to review plan investments" occurs when directors "*renew*[] imprudent contracts" (emphasis added)), *aff'd*, 339 F. App'x 46 (2d Cir. 2009); *Whitfield*, 682 F. Supp. at 196 (breach where it "become[s] clear that the investment was *no longer* proper" (emphasis added)). This case thus would be different if plaintiffs' theory was that Fidelity had breached a duty to respond to some materially new fact or circumstance affecting the use and allocation of float income. FB42 n.19. But plaintiffs have asserted no such claim. Instead they merely challenge the continuing adherence to practices implemented long ago. That challenge is time-barred.

*Third*, plaintiffs complain that a contrary holding would leave Fidelity "free to continue violating its fiduciary duties … forever." PB73. The Ninth Circuit rejected precisely this argument in *Tibble*, explaining that enforcing the limitations period will not "give ERISA fiduciaries carte blanche" to continue "imprudent" practices forever. 711 F.3d at 1069. The Ninth Circuit emphasized that plaintiffs had been allowed "to put on evidence that significant changes in conditions occurred within the limitations period" requiring review and reconsideration of the challenged practices, but they "could not establish changed circumstances engendering a new breach." *Id.* "The potential for future beneficiaries to succeed in making that showing," however, "illustrates why our interpretation of [the six-

20

year limitations period] will not alter the duty of fiduciaries to exercise prudence on an ongoing basis." *Id.*

The same is true here. Plaintiffs could have tried to assert a claim based on the failure to respond to changed circumstances, but they chose instead to base their challenge to Fidelity's float income practices on grounds that were fully applicable when those practices were implemented by the mid-1990s. The failure of that claim will not bar future participants from enforcing Fidelity's duty to continue to ensure that its float income practices remain proper in light of changing facts and circumstances.

To the extent these plaintiffs are disappointed by the preclusion of their stale claims, their complaint lies with Congress. As the Ninth Circuit observed in agreement with the D.C. Circuit, "injustices can be imagined" with "the application of *any* statute of limitations," but ERISA's six-year statute "'suggests a judgment by Congress that when six years has passed after a breach or violation, and no fraud or concealment occurs, the value of repose will trump other interests, such as a plaintiff's right to seek a remedy.'" *Tibble*, 711 F.3d at 1068-69 (quoting *Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994)). That congressional judgment compels dismissal of plaintiffs' claims.

21

## III. THE DISTRICT COURT'S AWARD OF DAMAGES CANNOT BE SUSTAINED

The district court's damages award is also flawed. Plaintiffs—and the district court, which adopted plaintiffs' calculations—made no effort at all to (1) avoid double-counting the Plan's receipt of float income from the investment options, or (2) estimate the funds withheld for taxes, on which float was never earned. The award thus constitutes not only a prohibited "windfall," *Leigh v. Engle*, 727 F.2d 113, 139 (7th Cir. 1984), but also the kind of "plain injustice" that justifies reversal even under the standard plaintiffs invoke. PB47 (quoting *Gonzalez v. United States*, 681 F.3d 949, 950, 952 (8th Cir. 2012)).

### A. The Award Necessarily Gives Plaintiffs A Prohibited Double Recovery

The damages calculation on which the district court relied was based entirely on the theory that Fidelity kept the float income for itself. FB43-46. The district court specifically found, however, that Fidelity distributed float income to the Plan's investment options (on a pro rata basis) after deducting account expenses, thereby "benefit[ting] all shareholders of the investment option[s]," FDA370, *see* FDA373, which *necessarily included Plan participants*. In fact, the investment option in which fully a third of the Plan's assets were invested, the ABB Income Fund, had *only* Plan investors, meaning that the Plan received 100% of the value of the float income that the Income Fund received from Fidelity. FB43-46. This is

22

precisely the sort of "double-recovery windfall" that ERISA "abhor[s]." *Harms v. Cavenham Forest Indus., Inc.*, 984 F.2d 686, 693 (5th Cir. 1993).

Plaintiffs do not dispute that the district court's damages calculation utterly failed to take into account the float income participants received as investors in the recipient options. Plaintiffs instead urge the Court to disregard the omission on the ground that "Fidelity produced no evidence that any of the Plans' investment options actually received any float income." PB77 (emphasis omitted). But Gentile testified without contradiction that float income was distributed pro rata to the Plan's investment options, and the district court found as a matter of fact that that is exactly what happened. FDA370, 373-74. Moreover, with respect to the Income Fund specifically, plaintiffs were well aware that the ABB Income Fund received its pro rata share of the float interest earned in the omnibus accounts. Indeed, plaintiffs themselves expressly advised the district court that the parties had resolved a discovery dispute upon Fidelity's "agreement to produce a report showing the calculations supporting the allocation of 'float' … to the ABB Plans' Income Fund for one calendar quarter." Dkt. No. 337, Exh. DD, at 2. Gentile's unrebutted testimony and plaintiffs' own pre-trial acknowledgment demonstrate that if their trial damages theory had turned on the specific allocation of float income among various investment options, plaintiffs had ample record basis for developing those details.

23

Plaintiffs, however, chose an entirely different course at trial, hoping to establish that Fidelity *itself* took all the float income, which, if true, obviously would make any allocation among options irrelevant. But that theory imploded, forcing plaintiffs to retreat *after* trial to the *different* theory that distributing float income to the investment options (for the benefit of the Plan and other shareholders), rather than to the Plan alone, was a separate breach. But on that theory, the allocation among options is critical to the proof of any loss, because that loss depends on how much float income the Plan actually received as a shareholder in each investment option. The ABB Income Fund is merely the simplest example: because the Plan was the sole owner of the Fund, 100% of every dollar distributed to it benefitted the Plan, and thus recovering those dollars—as the damages award provides—would be a prohibited double recovery.

Given the change in liability theories between their trial proof and their post-trial brief, this case does not implicate the principle that a plaintiff at trial may establish damages based on a "just and reasonable inference" from the record, with a justifiably "approximate" calculation for the specific amount. PB76 (quoting *Martin v. Feilen*, 965 F.2d 660, 672 (8th Cir. 1992)). Here there is a complete disconnect between the loss plaintiffs tried to prove at trial (based on the theory that Fidelity provided the Plan with zero float income because it retained all float income for itself) and the loss the district court actually found (based on the theory

24

that Fidelity *did* provide the Plan with float income in its capacity as an investment-option shareholder, but not on a dollar-for-dollar basis). There is simply no "just and reasonable inference" that participants suffered $1.7 million in losses as a result of Fidelity keeping $1.7 million in float income for itself, when Fidelity did *not* keep that float income for itself, but instead distributed it to Plan investment options, for the benefit of the Plan and other shareholders.

The cases on which plaintiffs rely are not to the contrary. None casts doubt on the "plaintiff's ultimate burden of proof as to the issues of damages." *Brown v. Medtronic, Inc.*, 628 F.3d 451, 457 (8th Cir. 2010). At most, they permit a court to shift the burden of persuasion to the defendant where there is ambiguity as to the precise calculation of actual loss—such as a dispute over how to determine what percent of a fiduciary's profits are attributable to a breach. *See Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir. 1995); *Feilen*, 965 F.2d at 672; *Leigh*, 727 F.2d at 138-39; *Donovan v. Bierwirth*, 754 F.2d 1049, 1056-57 (2d Cir. 1985). The principle in those cases might have some application if, for example, plaintiffs had actually sought to establish how much the Plan lost when float income was distributed to the Plan investment options, and the parties had disputed the extent of the "dilution" in options where the Plan was not the only shareholder. A just and reasonable inference of loss might have substituted for mathematical precision in that situation.

25

The problem here is nothing like that. Plaintiffs simply never connected their post-trial theory of Fidelity's wrongdoing to any trial evidence of participant loss *caused by that particular wrongdoing*. And to the extent the trial record bears at all on their post-trial liability theory, that record establishes without ambiguity that Fidelity's distribution of float income *did* benefit the Plan, in its capacity as a shareholder in the investment options. The damages award essentially redistributes the same float income directly to the Plan—an impermissible windfall by any measure.

## B.    The Award Ignores Tax Withholding

The damages award also fails to take into account the undisputed record concerning tax withholding that occurred before any float income was earned from the Redemption Account. FB46-47. Plaintiffs do not deny that the district court wrongly included those withheld funds in the calculation of damages. In fact, plaintiffs admit that the amount of funds Fidelity withholds for tax purposes for all of its recordkept plans totals $2.8 *billion* dollars every year. PB78. Plaintiffs instead object that Fidelity did not adduce evidence establishing the specific amount of funds actually withheld for taxes from the ABB plan. *Id.* But again, the shape of the record stemmed directly from the plaintiffs thirteenth-hour change in their liability theory. When plaintiffs sought to prove at trial a loss resulting from an imagined Fidelity practice of keeping float income for itself, it sufficed for

26

Fidelity to disprove both liability *and* loss by showing that Fidelity did not actually keep *any* of the float income for itself. The problem of tax withholding became pertinent only after plaintiffs theorized that Fidelity breached its duties by distributing float income to Plan investment options, since the tax withholding occurred as part of that process.

## IV. THERE IS NO BASIS FOR HOLDING FIDELITY JOINTLY AND SEVERALLY LIABLE FOR ATTORNEYS' FEES

The district court held Fidelity jointly and severally liable with ABB for the full attorneys' fees award of $13.5 million, even though Fidelity prevailed on every breach theory asserted against it save for plaintiffs' narrow, float-related breach theories. That award cannot be sustained.

In order to obtain fees under ERISA, a party must obtain "'some degree of success on the merits.'" *In re Interstate Bakeries Corp.*, 704 F.3d 528, 537 (8th Cir. 2013) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2158 (2010)). Plaintiffs here achieved "success on the merits" against Fidelity *only* on their float-related claims, and those claims represented a minuscule slice of plaintiffs' case. Plaintiffs sought to hold Fidelity liable for $676.1 million in plan-lineup-related breach theories, compared to the $1.7 million they were awarded on their float-related claims. FB49. And Fidelity prevailed completely on the lineup claims. FDA332 ("Fidelity is not liable for ABB's [lineup-related] fiduciary breaches."). There is no basis in law or logic for requiring Fidelity to pay 100% of

27

the fees plaintiffs incurred to litigate claims on which Fidelity was 100% successful.

Plaintiffs offer only makeweight arguments in response. They first observe that Fidelity "has not identified any time entry in Plaintiffs' … submission that it contends relates exclusively to unsuccessful claims." PB85. Plaintiffs miss the point. The district court held Fidelity liable for *all* of plaintiffs' fees, *including* claims that were unsuccessful against Fidelity. This Court should reverse that threshold legal error and remand for a determination of the attorney time properly attributable to the float-related claims.

Next, plaintiffs suggest that Fidelity should be liable for the full fees award because Fidelity "vigorously litigated whether [lineup-related] actions were breaches," and ultimately "failed in its contention that they were not breaches." PB85-86. That argument makes no sense. The court concluded that *ABB* committed lineup-related breaches, but absolved Fidelity of all responsibility for those actions. Fidelity's "vigorous[]" litigation efforts were thus *successful*. Plaintiffs cite no case suggesting that a party can be held liable for fees relating to a claim on which it prevailed merely because it did not win every argument it made en route to victory, or because a different party lost on the same claim. There is no such case. This Court's precedents instead require that fees be "tailor[ed] … to reflect a relationship to the results obtained." *Shrader v. OMC Aluminum Boat*

28

*Grp., Inc.*, 128 F.3d 1218, 1221 (8th Cir. 1997). And as to Fidelity, the only positive "results obtained" were on the float-related claims. The award must be tailored to that result.

The cases plaintiffs cite (PB84) are irrelevant. As Fidelity already explained (FB55), *Walker v. HUD*, 99 F.3d 761 (5th Cir. 1996), imposed joint-and-several fee liability on defendants held liable for imposing a "single indivisible injury," *id.* at 773. Here, by contrast, ABB and Fidelity were each held liable for causing completely *distinct* injuries through wholly *different* conduct—ABB for making imprudent decisions with respect to investment option fees, and Fidelity for improperly handling float income. Plaintiffs' citations of *Concord Boat Corp. v. Brunswick Corp.*, 309 F.3d 494 (8th Cir. 2002), and *Fenster v. Tepfer & Spitz, Ltd.*, 301 F.3d 851 (7th Cir. 2002), are likewise off point: both approved cost or fee awards against parties who asserted similar positions and who *lost on all of those positions*. *Concord*, 309 F.3d at 497; *Fenster*, 301 F.3d at 851. And *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113 (5th Cir. 1995), is even further afield—it does not address costs or fees at all, but instead explores joint-and-several liability principles under maritime law. *Id.* at 1121-22.

Finally, plaintiffs falsely state that Fidelity has failed to propose any mechanism for allocating fees on the distinct claims, or "specify an amount or percentage" of the total award Fidelity should avoid. PB87. Fidelity's opening

29

brief did exactly that. FB53 n.21. In addition to a typical timesheet review, Fidelity cited cases authorizing an award measured by the proportion between the $1.7 million plaintiffs recovered from Fidelity for the float-related breach and the $36.9 million they recovered from ABB for the lineup-related breaches (about 4.6% of the total fee award) or an award measured by the proportion between what plaintiffs obtained from Fidelity and what they sought from Fidelity (a fraction of a percentage point). Neither option requires "green-eyeshade accounting" (PB88)—just grade-school arithmetic. And either would be vastly superior to the manifestly unjust outcome of holding Fidelity liable for millions of dollars in fees incurred to litigate claims Fidelity roundly defeated.

## CONCLUSION

For the foregoing reasons, and for the reasons previously stated, the judgment should be reversed.

Appellate Case: 12-2060     Page: 36     Date Filed: 07/01/2013 Entry ID: 4050744

Respectfully submitted,

/s/ Jonathan D. Hacker

RICHARD N. BIEN
LATHROP & GAGE, LLP
2345 Grand Boulevard
Suite 2800
Kansas City, Missouri 64108

JONATHAN D. HACKER
 *Counsel of Record*
BRIAN D. BOYLE
KATHRYN E. TARBERT
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300

*Attorneys for Defendants-Appellants Fidelity Management Trust Company
and Fidelity Management & Research Company*

Dated:  July 1, 2013

31

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,967 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface and type style requirements of Fed. R. App. 32(a)(5) & (6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

3.  The electronic brief was scanned through a virus detection program before it was filed on the Court's electronic filing system, and the brief is virus-free.

Dated: July 1, 2013

<div style="margin-left:50%">

/s/ Jonathan D. Hacker
Jonathan D. Hacker
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2013, I electronically filed the foregoing with

the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using

the appellate CM/ECF system.  All participants are registered CM/ECF users, and

will be served by the appellate CM/ECF system.

Dated:  July 1, 2013

/s/ Jonathan D. Hacker
Jonathan D. Hacker
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300